THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ENRIQUE MIRANDA MERRERO, Defendant-Appellant.

Second District   No. 83—355

Opinion filed February 1, 1984.—Rehearing denied March 6, 1984.

G. Joseph Weller and Paul J. Glaser, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan (Phyllis J. Perko and Raymond L. Beck, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE UNVERZAGT delivered the opinion of the court:

Defendant, Enrique Miranda Merrero, was charged in a four-count information with the offenses of murder (Ill. Rev. Stat. 1981, ch. 38, par. 9—1) and armed violence (Ill. Rev. Stat. 1981, ch. 38, par. 33A—2). At the conclusion of the trial, the jury returned verdicts of guilty on all counts. Defendant was sentenced to 40 years' imprisonment for the offense of murder. No sentence was imposed on the armed violence charge as a lesser-included offense of murder. The defendant appeals, contending: (1) that defendant's motion to suppress custodial statements should have been granted where defendant's waiver of his constitutional rights was not voluntary; (2) that improper references to the murder victim's family at trial and at the sentencing hearing constitutes reversible error; and (3) that a corrected mittimus deleting the armed violence charge should be issued.

The defendant was arrested for the shooting murder of Jesus Cruz on November 27, 1982, in front of Fernando's Tap on Tenth Street in North Chicago. Defendant was interrogated by David Fermaint of the North Chicago police department. After being read his *Miranda* warnings in Spanish, defendant signed a Spanish-version of the waiver of rights form and gave a custodial statement. In that statement, defendant said he went to Fernando's Tap on the night of the shooting and recognized a man there as one of three men who allegedly assaulted him three weeks earlier. The defendant remained in Fernando's until the man went outside. The defendant followed and shot the man with a .22-caliber pistol. The defendant then ran to a bar on Ninth and Lincoln Streets. As he was running, he threw the gun into a lot on Tenth Street. Defendant walked around until he was told by some men that he was wanted by the North Chicago police. The defendant again was read his *Miranda* warnings and asked to sign a waiver of rights form before he repeated his statement for a taped recording.

Prior to trial, defense counsel moved to suppress the defendant's

statements on the grounds that due to the defendant's limited mental capability and knowledge of the English language, the defendant did not understand his constitutional rights and, as such, his waiver was not knowingly, voluntarily and intelligently made. At the hearing on the motion, Officer Fermaint testified that the two interrogations were conducted in Spanish when the defendant indicated he had been in the United States about two years and spoke little English. The first interview was at 10:45 a.m. on November 27, and the second taped interview took place at 11:04 a.m. that day. During those interviews, Fermaint, who is fluent in Spanish, read the police department's Spanish version of the *Miranda* warnings to the defendant. After each line, Fermaint asked the defendant if he understood his right to which defendant replied that he did. Defendant was then told by Fermaint to read aloud the *Miranda* warning. Defendant did so and then signed the waiver of rights form. According to Fermaint, defendant never indicated he wanted a lawyer. He stated that no threats or force were used and the defendant did not seem to have trouble understanding Fermaint and his answers were responsive to Fermaint's questions.

On cross-examination, Fermaint admitted that there were some differences between the Spanish and English versions of the *Miranda* warning that the police department used. The Spanish version did not contain the statement, as in the English version, that the defendant may stop the interrogation at any time and request an attorney. Also, the Spanish version inquires whether the accused understood his rights, while the English version states that an accused must fully understand his rights before answering any questions.

The defendant testified, through an interpreter at the hearing, that he left Cuba in 1979. He completed a first grade education in Cuba. He admitted reading the warning forms presented to him by Fermaint; however, he stated that he did not think he understood the meaning of the warnings. He stated that he thought the right to remain silent meant that he was "to be quiet." When told that anything he said could be used against him, he thought it meant "to state why." He was not aware that he could stop talking at any time. Although he admitted he had been represented by a court-appointed attorney in prior criminal matters in the United States, he stated he did not understand his right to an attorney. Defendant also testified that although he did not ask for an attorney and that the police did not threaten or strike him, he signed the waiver of rights form because he thought he would be beaten if he did not do so. The motion was denied, the trial court finding the defendant's waiver to have been

knowing and voluntary.

At trial, the State's first witness was Madeline Cruz, the victim's wife. She testified that she and the deceased had spent the day of the shooting together. Around 8 p.m., on November 26, he left home to visit with his friends, Jose Gonzales and Jose Ayala. Over defense counsel's objection, Mrs. Cruz identified her husband from a family photograph of Cruz with his wife and daughter.

As defendant does not challenge the sufficiency of the evidence to convict, a summary of the significant testimony follows. Jose Ayala testified that around midnight on November 26, Ayala and Cruz, along with Jose Gonzalez and David Vargas, went to bars in North Chicago. Cruz went to Fernando's Tap at Tenth and Lincoln and the others went to another bar. Around 1:30 a.m., Ayala went to Fernando's where he spoke briefly with Cruz before going to the men's room. A few moments later, Ayala was told there was a fight outside. Ayala went outside and saw Cruz on the ground, his face covered with blood. The defendant was a half block away, shooting a gun.

Joseph Gonzalez testified that later that evening he went to Fernando's and that Cruz and he left the bar at about 2 a.m. Once outside, Gonzalez saw a Cuban give a pistol to the defendant and told him to "fire it." The defendant fired the gun five or six times, hitting Cruz who was standing on the sidewalk in front of Fernando's.

Eugenio Rivera testified that he was at Tony's bar on Ninth and Lincoln at 2 a.m. on the 27th. He stated that the defendant came into the tavern with a revolver in his hand and said that he had just finished killing someone on Tenth Street.

David Fermaint of the North Chicago police department testified about his interrogation of the defendant on November 27. The taped statement of the defendant was played to the jury, and a stipulated translation of the statement was transcribed on the record. The taped statement was substantially consistent with the defendant's first statement to Fermaint. The defendant, testifying on his own behalf through an interpreter, stated that on November 15, 1982, he was allegedly attacked by Cruz and two other men. Defendant saw Cruz again, by chance, at Fernando's Tap on Tenth and Lincoln on the night of November 26. While the defendant was there, defendant ran into Cruz in the men's washroom. He stated Cruz pushed defendant two or three times and the defendant then left the washroom. Later that night, the defendant followed Cruz as he was leaving the bar. The defendant stated Cruz had his hands in his pockets and looked at the defendant "like wanting to call [him]." The defendant then shot Cruz. The defendant stated that although he was "pretty well drunk,"

he thought that Cruz was going to attack him again. He did not see any weapon on Cruz. He said he was not trying to kill Cruz but was merely trying to scare him.

Following the conclusion of the testimony, the defense objected to the display of a family picture to the jury intended as a "life" picture of the victim. After hearing arguments from both sides, the court ruled that cardboard would be placed over the pictures of the victim's wife and child and that the photograph would be circulated through the jury but not allowed into the jury room during deliberation.

The jury found the defendant guilty on all counts. At a sentencing hearing, the trial judge heard testimony in aggravation from the victim's wife. No other witnesses testified at the hearing. The trial judge entered a judgment sentencing the defendant to 40 years' imprisonment for the offense of murder. With the concurrence of the State, the trial court did not impose a sentence on the armed violence charge, finding the latter to be a lesser-included offense of murder. The defendant's post-trial motion having been denied, this appeal followed.

■■ The defendant initially contends that the trial court erred in denying his motion to suppress the inculpatory statements made by him while in custody in violation of *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. He asserts that due to his subnormal intelligence and inability to understand the English language he could not knowingly, voluntarily and understandingly waive his constitutional rights to remain silent and to consult with an attorney during the custodial interrogation.

An accused is guaranteed under the constitution the rights of assistance of counsel and to remain silent during in-custody police interrogation. Any statement obtained in derogation of those rights is inadmissible in a subsequent criminal prosecution. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) A suspect may waive his constitutional rights provided he does so knowingly, voluntarily and intelligently. The determination of whether a waiver has been knowingly and intelligently made depends on the particular facts and circumstances of the case and the accused's background, experience and conduct. (*People v. Turner* (1973), 56 Ill. 2d 201, 205-06.) Although no single factor is determinative, the mental capacity and familiarity of the defendant with the English language must be taken into consideration in determining whether his actions are voluntary. (*People v. Baker* (1973), 9 Ill. App. 3d 654.) Unless a defendant possesses sufficient intelligence to understand his constitutional rights, the fact that his rights were read to him more than once is of little

consequence. *People v. Turner* (1973), 56 Ill. 2d 201, 205; *People v. Gonzales* (1974), 22 Ill. App. 3d 83, 87.

In the present case, the record is clear that the defendant was advised of his constitutional rights twice before making his statement to the police. The issue here centers on whether the defendant's waiver was knowing and intelligent. On a motion to suppress oral statements, the State has the burden to prove the voluntariness of the statement by a preponderance of the evidence. (*People v. Torres* (1973), 54 Ill. 2d 384, 392-93.) Mindful that the trial court is in a superior position to judge the credibility of the witnesses, the finding of the trial court as to whether a statement is voluntary will be sustained unless contrary to the manifest weight of the evidence. *People v. Higgins* (1972), 50 Ill. 2d 221, *cert. denied* (1972), 409 U.S. 855, 34 L. Ed. 2d 100, 93 S. Ct. 195; *People v. Baker* (1973), 9 Ill. App. 3d 654, 661.

The defendant argues that merely because he was able to read the *Miranda* warnings does not make his confession voluntary where he lacked the capacity to understand the meaning and effect of his confession and, therefore, could not have knowingly and voluntarily waived his rights. The defendant relies solely upon his testimony at the suppression hearing in support of his contention. He testified that he had only a first grade education in Cuba. He stated that while he read the warning forms he did not understand them. He testified that he thought the right to remain silent meant "to be quiet." When told that anything he said could be used against him, he thought the warning meant "to state why." He did not understand his right to an attorney. He also was not aware he could stop talking at any time. Further, he said he signed the waiver of rights forms because he thought he would be beaten by the police if he did not do so.

Balanced against this evidence, the defendant testified that his *Miranda* rights were read to him and that he told the interviewing police officer that he understood what was read to him. Furthermore, defendant admitted that since his arrival in the United States he was represented by court-appointed attorneys in prior criminal actions. On behalf of the State, Officer Fermaint testified that the defendant appeared coherent and responsive to his questions during the interrogation and the transcript of the taped statement corroborates this. The fact the defendant may have believed the police would have beaten him if he did not confess has no support in the record. The defendant testified that he was not threatened or beaten by the police.

On the basis of the testimony presented, the trial court found that the State had shown by a preponderance of the evidence that the

defendant voluntarily waived his constitutional rights. Aside from the defendant's own testimony at the suppression hearing, there is no evidence that the defendant's limited formal education and lack of familiarity with the English language prevented him from understanding his constitutional rights. (See *People v. Gonzales* (1974), 22 Ill. App. 3d 83.) In *Gonzales*, the defendant testified that he did not understand his constitutional rights. A psychologist testified that the defendant scored in the lower 1% of the population in language efficiency but defendant's nonverbal ability was average. The court concluded that the finding of the trial court that defendant's waiver was understanding was not contrary to the manifest weight of the evidence. In the instant case, the ruling of the trial court was not against the manifest weight of the evidence.

■ The defense also points out certain discrepancies between the police department's Spanish version of the *Miranda* warnings and the English version as further evidence that the defendant was not informed of his constitutional rights. Defendant argues that the Spanish version of the warnings inquires whether the accused understood his rights, while the English version states that an accused must fully understand his rights before answering any questions. Also, the Spanish version does not advise an individual of his right to stop the interrogation at any time. However, *Miranda* does not specify the precise language to be used in advising a defendant of his constitutional rights. It requires not a ritualistic recital of words but an intelligent conveyance of the right to remain silent and of the general right of counsel. (*People v. Prim* (1972), 53 Ill. 2d 62, 67, *cert denied.* (1973), 412 U.S. 918, 37 L. Ed. 2d 144, 93 S. Ct. 2731; *People v. Reyes* (1981), 102 Ill. App. 3d 820, 828; *People v. Walters* (1979), 69 Ill. App. 3d 906, 914-16; *People v. Sims* (1978), 58 Ill. App. 3d 668, 673-74.) Further, although an individual has the right to cut off questioning at any time, *Miranda* does not require that the individual be informed of this right as part of the warnings. (*Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602.) The defendant was advised he had the right to remain silent; that anything he said could be used against him; that he had the right to the presence of counsel during interrogation, and that he could have court-appointed counsel if he could not afford an attorney. The record shows that the defendant was fully informed of his constitutional rights.

■ Even if the defendant's statement was erroneously admitted, it was harmless error beyond a reasonable doubt where his statement was supportive of his testimony at trial and substantiated his assertion that his attack on Cruz was involuntary manslaughter, and could

not have contributed to the finding of guilt by the jury. (*People v. Smith* (1967), 38 Ill. 2d 13, 15; *People v. Felton* (1982), 108 Ill. App. 3d 763, 767.) Aside from the defendant's exculpatory statements during his trial testimony that Cruz approached him with his hands in his pockets and that the defendant shot Cruz in order to scare him, his testimony that he recognized Cruz at Fernando's as one of three men who allegedly assaulted him three weeks earlier, that the defendant followed him outside and shot him is essentially the same statement he gave to police during interrogation. Therefore, the admission of the defendant's custodial statement does not constitute reversible error.

■ The defendant next contends that during trial, and again at the sentencing hearing, evidence concerning the deceased's family was admitted which was irrelevant and highly prejudicial, thereby denying the defendant a fair trial. Specifically, defendant first contends that during trial the trial court abused its discretion in allowing into evidence a family picture of the deceased as the State's "life" picture of the deceased. Second, the defendant argues that the trial court erred in allowing the victim's wife to testify in aggravation at the sentencing hearing. The State responds to both contentions that the defendant has waived appellate consideration of these claims of errors by failing either to object to the admissibility of this evidence or to raise them in his post-trial motion.

The failure to object to the admission of this evidence or to raise it in the post-trial motion operates as a waiver of the right to consider the question on appeal. (*People v. Jackson* (1981), 84 Ill. 2d 350, 358-59.) As the evidence is not so closely balanced on these issues nor is it contended that the evidence is insufficient to establish defendant's guilt beyond a reasonable doubt, we see no reason for departing from the general rule that issues not properly preserved for review are waived. *People v. Jackson* (1981), 84 Ill. 2d 350, 359-60.

■ The defendant's final contention is that the cause should be remanded with directions that a corrected mittimus be issued reflecting that defendant was convicted only on the murder charge. As the State concedes that the judgment of conviction of the offense of armed violence should be vacated as a lesser-included offense of the murder charge (*People v. Donaldson* (1982), 91 Ill. 2d 164; *People v. King* (1977), 66 Ill. 2d 551, *cert. denied* (1977), 434 U.S. 894, 54 L. Ed. 2d 181, 98 S. Ct. 273), the State's request for an assessment of costs against the defendant should be denied. As this court held in *People v. Smith* (1983), 113 Ill. App. 3d 917, 926, where a defendant has prevailed solely on his request for remandment with directions for

the issuance of a corrected mittimus, he has prevailed on one of the issues raised on appeal and, therefore, the State's request for costs will be denied. Accordingly, this cause is remanded with directions that a corrected mittimus be issued to reflect the actual sentence imposed. The State's request for assessment of costs is denied.

For the reasons stated, the judgment of the circuit court of Lake County is affirmed. This cause is remanded with directions that a corrected mittimus be issued to delete the armed violence charge.

Affirmed in part and remanded with directions.

SEIDENFELD, P.J., and REINHARD, J., concur.