# Illinois Official Reports

## Appellate Court

---

### *People v. Colon*, 2018 IL App (1st) 160120

---

| | |
|---|---|
| Appellate Court Caption | THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. PABLO COLON, Defendant-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-16-0120 |
| Filed | June 28, 2018 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 12-CR-1872603; the Hon. Matthew E. Coghlan, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Stephen L. Richards, of Chicago, for appellant.<br><br>Kimberly M. Foxx, State's Attorney, of Chicago (Alan J. Spellberg, Tasha-Marie Kelly, and Hareena Meghani-Wakely, Assistant State's Attorneys, of counsel), for the People. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion.<br>Presiding Justice Burke and Justice Ellis concurred in the judgment and opinion. |

**OPINION**

¶ 1    Defendant Pablo Colon was convicted after a jury trial of first degree murder and sentenced to 40 years with the Illinois Department of Corrections (IDOC).

¶ 2    On this appeal, defendant claims (1) that the trial court erred by allowing, as a tacit admission by defendant, the testimony of Wayne Kates recounting statements by Marco Ramirez and Daniel Guerrero that were made during a gang meeting at which defendant was present and that described the murder; (2) that the trial court erred by granting the State's motion to admit proof of gang membership and affiliation, including expert testimony about gangs and gang identification; (3) that the trial court erred by overruling defendant's objection to the testimony of Mario Gallegos, the only eyewitness, who identified defendant as one of two people in a lineup who "kind of look like the people that were there the date it had occurred," on the grounds that the tentative statement did not qualify as an identification and was more prejudicial than probative; (4) that the trial court erred by failing to grant defendant's motion to suppress defendant's statements to the police where the police did not inform him that he had a right to stop questioning at any time on the ground that the Illinois right to counsel is broader than the federal right and that suspects in Illinois should be informed of their right to terminate questioning at any time; (5) that defendant's sentence of 40 years was excessive and should be reduced to 20 years where defendant was 20 years old at the time of the offense and a minor participant; and (6) that defendant's 40-year sentence was disproportionate to the 30-year sentence received by codefendant Gary Sams.

¶ 3    For the following reasons we affirm.

BACKGROUND

¶ 5    In the Analysis of each claim below, we provide a detailed description of the evidence relevant to resolve that particular claim.

¶ 6    In sum, the State's evidence at trial established that on May 29, 2010, at midnight, a group of men, who belonged to the same gang, approached two men on a nearby street because one of the two men was wearing a red shirt, which was the color of a rival gang. One of the two men, Mario Gallegos, was able to escape, and he testified at trial as the State's sole eyewitness. The other man, Alan Oliva, who was wearing the red shirt, was beaten to death. The State's evidence included a videotaped confession by defendant describing his role in the offense, in which he admitted that he was the first person to approach the two men, that he was the one who demanded to know their gang affiliation, and that he kicked the murder victim in the head after the victim was down on the ground. The State's evidence also included testimony by fellow gang member Kates, concerning statements made by two of the attackers at a subsequent gang meeting attended by defendant. Defendant's statement to the police and Kates's testimony varied from each other, in that defendant stated to the police that there were six to eight men and that they exited a party to approach the murder victim and the victim's companion, while Kates reported that two of the attackers, Ramirez and Guerrero, claimed that they exited a vehicle with defendant and that they were the only three men to approach the murder victim and that the victim was alone.

¶ 7    After listening to all the evidence, arguments and jury instructions, the jury convicted defendant of first degree murder, and the trial court sentenced him to 40 years with IDOC.

Defendant filed a timely notice of appeal, and this appeal followed.

¶ 8                                      ANALYSIS
¶ 9                                  I. Kates's Testimony
¶ 10     Defendant claims that the trial court erred by allowing the testimony of Kates, which described statements made by fellow gang members, Ramirez and Guerrero. The statements by Ramirez and Guerrero were made during a gang meeting at which defendant was also present. The statements included Ramirez's statement that the three men—Ramirez, Guerrero and defendant—exited a vehicle together in order to approach the victim and that "they just kept beating the guy until he stopped moving and then at that point, basically, they took off before the cops would come." Since defendant was present at the gang meeting and did not object to Ramirez's and Guerrero's statements, the trial court admitted the statements as an "admission by silence" by defendant. See Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015). Specifically, the trial court ruled:

> "Court feels it did qualify as an admission by silence. The defendant was present during this conversation. He was implicated, it would have been something that you would expect him to deny. Court will allow it to come in as an exercise of its discretion. Motion *in limine* denied."

For the following reasons, we cannot find that the trial court erred.

¶ 11                               A. Standard of Review
¶ 12     The admission of evidence is generally within the sound discretion of the trial court, and we will not disturb a trial court's evidentiary rulings absent an abuse of discretion. *People v. Romanowski*, 2016 IL App (1st) 142360, ¶ 21 (citing *People v. Morgan*, 197 Ill. 2d 404, 455 (2001)). An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *People v. Lerma*, 2016 IL 118496, ¶ 23. However, to the extent that admissibility of evidence requires the interpretation of a rule and its intended scope, our review is *de novo*. *Romanowski*, 2016 IL App (1st) 142360, ¶ 21. *De novo* consideration means that we perform the same analysis that the trial court would perform. *People v. Jones*, 2018 IL App (1st) 151307, ¶ 21.

¶ 13     On appeal, defendant claims that he preserved this error for our review by objecting both at trial and in a posttrial motion, and the State does not argue otherwise. See *People v. Sebby*, 2017 IL 119445, ¶ 48 ("To preserve a purported error for consideration by a reviewing court, a defendant must object to the error at trial and raise the error in a posttrial motion."). Since the issue was preserved for our review, if there was an error, the State would bear the burden of proving that the error was harmless beyond a reasonable doubt. *Lerma*, 2016 IL 118496, ¶ 33. However, for the reasons discussed below, we do not find that an error occurred.

¶ 14                             B. The Tacit Admission Rule
¶ 15     The statements at issue were admitted pursuant to Illinois Rule of Evidence 801 (eff. Oct. 15, 2015), which both defines hearsay and specifies that certain statements are not considered hearsay. The rule defines "hearsay" as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. Oct. 15, 2015). The rule then specifies that certain

statements are simply "not hearsay." Ill. R. Evid. 801(d) (eff. Oct. 15, 2015). Thus, these statements are not exceptions to the rule against hearsay; rather, they are simply not hearsay to begin with. These statements include a "Statement by Party-Opponent." Ill. R. Evid. 801(d)(2) (eff. Oct. 15, 2015). A statement by a party opponent includes "a statement of which the party has manifested an adoption or belief in its truth." Ill. R. Evid. 801(d)(2)(B) (eff. Oct. 15, 2015).

¶ 16    Adopted statements include what the case law calls a "tacit admission"[1] or, as the trial court described it, an "admission by silence."[2] The "tacit admission rule" is well established in our case law. See *People v. Donegan*, 2012 IL App (1st) 102325, ¶ 67 ("the tacit admission rule"); *People v. Soto*, 342 Ill. App. 3d 1005, 1013 (2003) ("the tacit-admission rule"); *People v. Campbell*, 332 Ill. App. 3d 721, 734 (2002) (a statement is admissible as a "tacit admission" "if sufficient evidence supports a finding that, in light of the totality of the circumstances, a defendant remained silent when faced with an incriminating statement, which, if untrue, would normally call for a denial"); *People v. Goswami*, 237 Ill. App. 3d 532, 535 (1992) (discussing "the rule" concerning "a tacit admission"); *People v. Childrous*, 196 Ill. App. 3d 38, 53 (1990) ("When a statement is made in the presence and hearing of an accused, incriminating in character, and such a statement is not denied, contradicted or objected to by him, both the statement and the fact of his failure to deny it are admissible in a criminal trial as evidence of his acquiescence in its truth.").

¶ 17    The tacit admission rule provides, "When a statement that is incriminating in nature is made in the presence and hearing of an accused and such statement is not denied, contradicted, or objected to by him, both the statement and the fact of his failure to deny it are admissible in a criminal trial as evidence of the defendant's agreement in its truth." *Soto*, 342 Ill. App. 3d at 1013; *Donegan*, 2012 IL App (1st) 102325, ¶ 67; *Campbell*, 332 Ill. App. 3d at 734; *Goswami*, 237 Ill. App. 3d at 535-36; *Childrous*, 196 Ill. App. 3d at 53; *Miller*, 128 Ill. App. 3d at 583. Our case law has uniformly found that silence can constitute assent. *Donegan*, 2012 IL App (1st) 102325, ¶ 67; *Soto*, 342 Ill. App. 3d at 1013; *Campbell*, 332 Ill. App. 3d at 734; *Goswami*, 237 Ill. App. 3d at 535-36; *Childrous*, 196 Ill. App. 3d at 53 ("assent may be manifested by silence"); *Miller*, 128 Ill. App. 3d at 583 (when "silence is an admission of guilt, proof of a defendant's silence is essential to the admission of the declaration").

¶ 18    The necessary elements for admissibility under the tacit admission rule are (1) that the statement incriminates the defendant such that the natural reaction of an innocent person would be to deny it, (2) that the defendant heard the statement, and (3) that the defendant had an opportunity to reply or object and instead remained silent. *Donegan*, 2012 IL App (1st) 102325, ¶ 67; *Soto*, 342 Ill. App. 3d at 1013; see also *Campbell*, 332 Ill. App. 3d at 734; *Goswami*, 237 Ill. App. 3d at 535-36; *Childrous*, 196 Ill. App. 3d at 53; *Miller*, 128 Ill. App. 3d at 583.

¶ 19    The statement need not be made "in an accusatory tone," so long as it is "evident that defendant was being painted or portrayed as a participant in illegal and prohibited activity." *Miller*, 128 Ill. App. 3d at 584; *Soto*, 342 Ill. App. 3d at 1013 (quoting *Miller* for the same point). In *Goswami*, 237 Ill. App. 3d at 535, the appellate court suggested the need for "an

---

[1]Before 2015, Rule 801(d)(2) was titled "Admission by Party-Opponent." Ill. R. Evid. 801(d)(2) (eff. Jan. 1, 2011). Thus, courts used the term "tacit admission."

[2]See *People v. Goswami*, 237 Ill. App. 3d 532, 536 (1992) (using the term " 'an admission by silence' " (quoting *People v. Miller*, 128 Ill. App. 3d 574, 583 (1984))).

- 4 -

accusative statement," when it stated that "a defendant's silence following an accusative statement may be considered as a tacit admission." While the statement must be "accusative" in that it charges the defendant with participation in an illegal activity, *Miller* and *Soto* establish that the tone in which the statement was made need not be accusative. *Miller*, 128 Ill. App. 3d at 584; *Soto*, 342 Ill. App. 3d at 1013.

¶ 20                                    C. Testimony at Issue

¶ 21        We describe here in detail the specific testimony at issue.

¶ 22        Kates testified that, on August 21, 2010, he went with his brother, Walter Mullenix, to "a gang meeting" at Bernard Monreal's house. The assistant state's attorney (ASA) asked who was at Monreal's house, and Kates identified the people there as (1) himself, (2) Kates's brother, (3) defendant, (4) Ramirez, (5) Guerrero, and (6) Monreal. The topics discussed at the meeting were "the transferring of power from Bernard Monreal to [Kates's] brother," the lack of guns, and the gang's lack of presence on the street. Kates observed that "there wasn't enough people hanging out, outside." With respect to the lack of presence, Kates asked "why there wasn't anyone out there [?]" and Marco Ramirez replied that "the area was hot." At this point in Kates's testimony, the ASA inquired again who was there, specifically asking, "During *this* conversation who was present with you?" (Emphasis added.) Kates answered, "It was me, my brother Walter, Bernard Monreal, Daniel Guerrero, Marcos Ramirez and [defendant]." Thus, there were only six people at the meeting and all six were present at this point in the conversation.

¶ 23        Kates testified that the meeting occurred in Monreal's living room. The ASA asked, "how close were you to each other during the time you had this discussion?" Kates replied a "couple [of] feet." Kates testified that Ramirez then explained why the area was hot. Ramirez stated that on May 29, 2010, he was driving in a vehicle with defendant, Daniel Guerrero and a man known as "Chucky" when they spotted a man who looked "like a rival gang member or a flake." Ramirez stated that "they pulled into the alley behind a restaurant called a barbecue patio and at that point Marcos Ramirez said that [Ramirez], Daniel Guerrero and [defendant] exited the vehicle." Ramirez stated that they wanted to check if the man had any gang tattoos or gang affiliation. When Ramirez asked the man what gang he belonged to, he responded that he did not belong to a gang and then turned and tried to run away.

¶ 24        Kates testified that Guerrero stated that "he caught up to the guy and he hit him with a baseball bat and he fell down." Then Ramirez stated that "he ran up to him and he started stabbing him while he was on the ground." Ramirez stated that "he was trying to stab him in the head." Ramirez further stated that "they just kept beating the guy until he stopped moving and then at that point, basically, they took off before the cops would come."

¶ 25        Kates testified that Monreal, Guerrero, Ramirez, Mullenix, and defendant were all members of the Satan Disciples gang that Kates also belonged to.

¶ 26        On cross, Kates testified that the only two people who talked about the murder at the meeting were Ramirez and Guerrero and that defendant did not make any statements that he stabbed anyone or wielded a baseball bat. In addition, Kates testified that, during the meeting, defendant never made any statements admitting any activities on the date of the murder. Kates testified that he arrived at the meeting at 11 a.m. and that he was there an hour.

¶ 27                    D. Elements of Tacit Admission Rule

¶ 28        The first requirement of the tacit admission rule actually has two parts: that the statement was incriminating and that the natural reaction of an innocent person would be to deny it. *E.g. Donegan*, 2012 IL App (1st) 102325, ¶ 67; *Soto*, 342 Ill. App. 3d at 1013. Ramirez's statement that "*they* just kept beating the guy until he stopped moving" implicated defendant in the murder. (Emphasis added.) Ramirez stated that defendant had exited the vehicle with Ramirez and Guerrero; thus, all three of them exited together as one unit to approach the victim. The fact that they continued to move as one unit was evidenced by Ramirez's subsequent statement that "*they* drove off before the cops would come." (Emphasis added.) These statements of "they" included defendant since defendant had arrived at the scene in the same vehicle and exited it with Ramirez and Guerrero. Ramirez's and Guerrero's description of their own acts of stabbing and beating were the initial acts in one course of conduct that ended with their "beating the guy until he stopped moving." Thus, Ramirez's and Guerrero's statements implicated and incriminated defendant.

¶ 29        The natural reaction of an innocent person would have been to deny it or, at least, to deny his own involvement. *E.g. Donegan*, 2012 IL App (1st) 102325, ¶ 67; *Soto*, 342 Ill. App. 3d at 1013. At this point in the meeting, Ramirez was trying to explain to Kates why the area was so "hot" with police that the gang could no longer maintain a presence on the street. Kates, according to his testimony, was the brother of the person now taking over the "power" of the gang. If defendant was not at fault for this turn of events, one would expect him to protest to the gang leadership—who were demanding an explanation—that he was not one of the people who had beaten an innocent man to death, thereby leading to the extreme police presence on the street. However, defendant remained silent, thereby indicating his assent to Ramirez's and Guerrero's statements, including Ramirez's statement that "*they* just kept beating the guy until he stopped moving." (Emphasis added.)

¶ 30        The second requirement is that the defendant heard the statement. *E.g. Donegan*, 2012 IL App (1st) 102325, ¶ 67; *Soto*, 342 Ill. App. 3d at 1013. Kates testified that there were only six people at the meeting, that the six of them were meeting in a living room, and that they were only a couple of feet away from each other. Immediately before Kates testified about Ramirez's and Guerrero's description of the murder, the ASA asked, "During *this* conversation who was present with you?" (Emphasis added.) Kates answered, "It was me, my brother Walter, Bernard Monreal, Daniel Guerrero, Marcos Ramirez and [defendant]." Thus, given the small size of the meeting, the physical proximity of the participants to each other, the private and confidential nature of the meeting space, and Kates's testimony about who was present for "this conversation," we cannot find that the trial court erred in concluding that defendant heard Ramirez's and Guerrero's statements.

¶ 31        The third requirement is that the defendant had an opportunity to reply or object and instead remained silent. *E.g. Donegan*, 2012 IL App (1st) 102325, ¶ 67; *Soto*, 342 Ill. App. 3d at 1013. In Kates's testimony, there was no indication that defendant was prevented at this meeting of only six people from objecting or replying. In addition, the cross-examination established that defendant was silent concerning the murder during the meeting. Thus, all three requirements for admission under the tacit admission rule were satisfied, and we cannot find that the trial court erred by admitting these statements.

- 6 -

¶ 33    Second, defendant claims that the trial court erred by granting the State's motion *in limine* and admitting proof of gang membership and affiliation, including expert testimony. The State claims that this evidence was relevant to establish motive and common design. In response, defendant argues that, aside from Kates's testimony discussed above, there was no evidence that defendant knew of a common gang purpose or motive for the murder and that defendant's statements to the police "contained no hint of a gang motive."

¶ 34    "Evidentiary rulings regarding gang-related evidence are reviewed for abuse of discretion." *People v. Villarreal*, 198 Ill. 2d 209, 232 (2001); *People v. Johnson*, 208 Ill. 2d 53, 102 (2003); *People v. Gonzalez*, 142 Ill. 2d 481, 489-90 (1991). Although there is "widespread disapproval that exists toward street gangs," a defendant may not insulate the fact finder from the fact of his gang membership, despite prejudice toward it, if that fact is relevant to understanding the case. *Gonzalez*, 142 Ill. 2d at 488-89; *People v. Smith*, 141 Ill. 2d 40, 58 (1990) (although "in metropolitan areas, there may be strong prejudice against street gangs," such evidence need not be excluded if relevant). It is left to the discretion of the trial court to weigh the probative value and prejudicial effect of this evidence to determine whether it should be admitted in any given case. *Gonzalez*, 142 Ill. 2d at 489. As we observed above, an abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful or unreasonable to the degree that no reasonable person would agree with it. *Lerma*, 2016 IL 118496, ¶ 23.

¶ 35    "Gang membership evidence is admissible only when there is sufficient proof that the membership is related to the crime charged." *Villarreal*, 198 Ill. 2d at 232; *Johnson*, 208 Ill. 2d at 102; *Smith*, 141 Ill. 2d at 58 (admissibility requires "sufficient proof that such membership or activity is related to the crime charged"). If the State does establish a relationship between membership and the crime charged, it must also show that membership is "relevant to an issue in dispute" and that "its probative value is not substantially outweighed by its prejudicial effect." *Villarreal*, 198 Ill. 2d at 232; *Johnson*, 208 Ill. 2d at 102; *People v. Johnson*, 159 Ill. 2d 97, 118 (1994). "One of the purposes for which gang evidence is admissible is to 'provide a motive for an otherwise inexplicable act.' " *Villarreal*, 198 Ill. 2d at 233 (quoting *Smith*, 141 Ill. 2d at 58); see also *Smith*, 141 Ill. 2d at 58 ("admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act").

¶ 36    Defendant's statement to the police, by itself, established that the murder was gang-related and gang-motivated and that, specifically, defendant's participation in the offense was gang-related and gang-motivated.

¶ 37    Before we discuss defendant's statement, we observe that his statement contained jargon and nicknames, and we provide here the definition and explanation for these terms given by a fellow gang member, Kates, during Kates's trial testimony. For example, he testified that to "check" someone meant "to see if they have any gang affiliation or gang tattoos." Kates also testified that "Klepto" was the nickname of fellow gang member Ramirez.

¶ 38    In part of defendant's videotaped statement to the police, defendant stated that he (defendant) was at a party when "Klepto" (Ramirez) entered the party and stated that he (Ramirez) had observed members of "the Counts" at a nearby gas station. Immediately after Ramirez's announcement, six to eight people exited the party. Defendant described how he approached the murder victim and "checked" him and what happened next:

    "Yeah, I'm the one who checked dude. I was like what's up n***, what y'all is? And right away first n*** took off running and then boy was just stuck right there. Klep hit

him in [the] back with the bat. First dude went down, the dude that was right there, I think that might have been the dude that got stabbed. I'm not sure cause I don't know which one got stabbed. Klep hit him in the back. Boom. F*** the other dude took off across the street, couple of people went chasing after him but he was gone. Came back. Everybody was just like whooping him. I kicked him probably in the face. Yeah I kicked him in the face. That's when he must've got stabbed."

¶ 39　　　Later in the statement, defendant stated:

"When I checked dude right here, he stands up to me. You know what I'm sayin[g]. *** Everybody's trying to circle around him. *** He's already like this, looking around. Boom. This guy gets cracked in the back. *** This dude is already on the floor. People are kicking him, punching—there's just a crowd. That's why I'm sayin[g] I don't know who stabbed him really cause there was a crowd. So I turned around, he's right there. By that time, I kick him, bow, you know what I'm sayin[g]. I might have said a couple of things to him. You know what I mean. By that time, f***, there was just like cars on the street. Cars started beeping. Like started pulling over. You know what I'm sayin[g]. I ran; I was the first one there and I was the first one to run."

¶ 40　　　Later in his statement, defendant repeated: "I was the first one to talk to the dude. And I checked him, whatever. F***, before the dude even saying anything he was—started getting a whopped. You know he got hit by the bat."

¶ 41　　　In his statement, defendant emphasized the importance of gang affiliation and colors in the murder, stating: "I was the first one, so I seen them. They're wearing all red. You know what I'm saying? That's the Counts' colors." After observing these colors, defendant demanded of the murder victim: " 'What's up b***? You know what I'm saying? What the f*** you all doing? It's the wrong side.' " After that, "everbody's punching and kicking him. *** I'm not going to lie. Kicked him, Ugh!"

¶ 42　　　Thus, defendant's statement establishes that defendant was the first person to approach the murder victim and that defendant's primary purpose in approaching the victim was to establish whether the victim was a member of a gang and, if so, which one. While the gang testimony may have had a prejudicial, even horrifying, impact on the jury, it would be impossible to understand why this group of men would spontaneously exit a party and beat an innocent passerby to death without this evidence, in particular, the victim's wearing of the color red, which was the color of a rival gang. As a result, we can find no error here by the trial court in granting the State's motion and admitting gang evidence.

¶ 43　　　　　　　　　　　　　III. Gallegos's Identification

¶ 44　　　Third, defendant claims that the trial court erred by admitting, over defendant's objection, certain testimony by Mario Gallegos, one of the two victims of the attack and the only eyewitness to testify at trial. Gallegos testified that he had selected defendant at a prior lineup as being someone who "kind of look[ed] like the people that were there the date it had occurred." Defendant claims that this testimony was too speculative to be relevant and too inconclusive to qualify as an identification. The trial court found that Gallegos's identification was "tentative" but that his tentativeness went to weight not admissibility. For the following reasons, we find that the trial court did not abuse its discretion by admitting this testimony.

¶ 45    Concerning the lineup that he viewed on September 12, 2012, Gallegos testified on direct examination:

"[ASA]: Showing you what has been marked as People's Identification—photograph marked as People's Exhibit No. 19. Do you recognize what's depicted in that photograph?

GALLEGOS: Yeah, I see the lineup.

[ASA]: This is a lineup you viewed?

GALLEGOS: Yes.

[ASA]: Do you remember seeing that lineup back in 2012?

GALLEGOS: Yes, I do.

[ASA]: Is there anybody in that lineup that you told the police officers you recognized?

GALLEGOS: I pointed out two of them.

[ASA]: Going from left to right on the photograph itself, starting here on the left side, going to the right, which person did you identify in that photograph?

GALLEGOS: Two in the middle.

[ASA]: Two in the middle?

GALLEGOS: Yeah.

[ASA]: What did you tell the officers pertaining to your identification of these two individuals at that time?

GALLEGOS: They kind of look like the people that were there the date it had occurred.

[ASA]: This is going back to the incident when you and Alan were struck with the bat?

GALLEGOS: Yes.

[ASA]: You told them that they kind of look like the persons?

GALLEGOS: Yes."

¶ 46    Immediately after the above testimony, defense counsel objected to its admission on the basis that it was inconclusive. At the ensuing sidebar, the ASA stated that defendant was one of the two people whom Gallegos testified "kind of look like the people that were there." The trial court agreed with defense counsel that this identification was "tentative" but ruled that the tentativeness of the identification "go[es] towards weight rather than its admissibility" and, thus, it was admissible.

¶ 47    After the sidebar, Gallegos further testified:

"[ASA]: Again Mr. Gallegos, you told us moments ago I believe that the two individuals in the middle that you say that look—well, tell me again, what do you recognize them as?

GALLEGOS: As the guys that were there.

[ASA]: You said earlier that guys, you believe they were the guys over there or possibly the guys?

GALLEGOS: Possibly."

¶ 48    On cross, Gallegos testified:

"DEFENSE COUNSEL: When you saw this actual, physical lineup in September of 2012, you indicated that you made an identification of two people, is that correct?

GALLEGOS: Yes.

DEFENSE COUNSEL: Number two and number three, is that right?

GALLEGOS: Yes.

DEFENSE COUNSEL: You're not—you were unable to positively determine that either number two or number three were there, is that correct?

GALLEGOS: That's possible.

DEFENSE COUNSEL: Just possible.

GALLEGOS: It's possible.

DEFENSE COUNSEL: When you say either two or three could have been there, is your testimony that it may have been either of these two people or that possibly both of them were there or both of them weren't there?

GALLEGOS: I wasn't—well, possibly like I said. They were Hispanic."

¶ 49    On cross, Gallegos further testified:

"DEFENSE COUNSEL: Mario, you're not really certain that [defendant] was there on 34th Street, my client, the individual you saw in that lineup in September of 2013?

GALLEGOS: I said possibly.

DEFENSE COUNSEL: Possibly. It's possible he may not, is that correct?

GALLEGOS: Possibly, like I said."

¶ 50    Whether a trial court erred in admitting a statement as a prior statement of identification is generally an issue that a reviewing court will reverse only for an abuse of discretion. *People v. Temple*, 2014 IL App (1st) 111653, ¶ 33. As we observed above, an abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or unreasonable, or where no reasonable person would agree with the position adopted by the trial court. *Temple*, 2014 IL App (1st) 111653, ¶ 33.

¶ 51    As we also observed above, Rule 801 of the Illinois Rules of Evidence defines both what statements constitute hearsay and what statements do not constitute hearsay. Ill. R. Evid. 801 (eff. Oct. 15, 2015). The rule provides that a statement is not hearsay, if, in a criminal case, (1) "the declarant testifies at the trial or hearing," (2) the declarant is "subject to cross-examination concerning the statement," and (3) the statement is "one of identification of a person made after perceiving the person." Ill. R. Evid. 801(d)(1)(B) (eff. Oct. 15, 2015). In the case at bar, Gallegos (1) testified at trial and (2) was subject to cross-examination. However, defendant claims that the State failed to establish the third requirement because the statement was too inconclusive to qualify as a statement "of identification." Ill. R. Evid. 801(d)(1)(B) (eff. Oct. 15, 2015).

¶ 52    In addition, defendant argues that the statement should have been excluded pursuant to Illinois Rule of Evidence 403, which provides, in relevant part, that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issue, or misleading the jury." Ill. R. Evid. 403 (eff. Jan. 1, 2011). Defendant argues that the statement was too speculative to qualify as relevant.

¶ 53    *People v. Tisdel*, 201 Ill. 2d 210 (2002), is instructive. In *Tisdel*, the defendant argued that the trial court erred in admitting, as identification evidence, testimony by State witnesses that

they had viewed prior lineups containing persons other than defendant and had not made an identification. *Tisdel*, 201 Ill. 2d at 215. The supreme court construed " 'statements of identification' to include the entire identification process." *Tisdel*, 201 Ill. 2d at 219. In reaching this conclusion, the supreme court observed that defense counsel had an opportunity to, and did, in fact, cross-examine the witnesses extensively. *Tisdel*, 201 Ill. 2d at 221; see also Ill. R. Evid. 801(d)(1)(B) (eff. Oct. 15, 2015) (for a prior identification to be admissible in a criminal case, the declarant must be "subject to cross-examination concerning the statement"). Similarly, in our case, the statement was part of the identification process and was subject to cross-examination at trial.

¶ 54    In addition, in reaching its finding, the *Tisdel* court relied on *Neil v. Biggers*, 409 U.S. 188 (1972). *Tisdel*, 201 Ill. 2d at 220. Normally, to assess identification testimony, Illinois courts consider the five factors set forth in *Biggers*, 409 U.S. at 199-200: (1) the witness's opportunity to view the defendant during the offense, (2) the witness's degree of attention at the time of the offense, (3) the accuracy of any prior description by the witness, (4) the witness's level of certainty at the identification, and (5) the length of time between the crime and the identification. *People v. Slim*, 127 Ill. 2d 302, 307-08 (1989). The court takes all five factors into consideration, as well as all the circumstances. *Biggers*, 409 U.S. at 198-200. The witness's level of certainty is only one of the five factors. See *People v. Allen*, 376 Ill. App. 3d 511, 524 (2007) (studies show that there are "low correlations between the witness's confidence and the accuracy of her identification"). In sum, we cannot find that the trial court abused its discretion by admitting the lineup testimony as a prior statement of identification, where defendant's argument is based on only one of the *Biggers* factors, where the Illinois Supreme Court in *Tisdel* found that the entire identification process qualifies as a statement of identification, and where defendant had an opportunity to, and did, in fact, cross-examine the witness extensively concerning the statement and the tentative nature of his identification.

¶ 55    Defendant further argues that the statement's probative value was outweighed by its prejudice and that Gallegos identified defendant only because he was "Hispanic." Gallegos's "Hispanic" comment was brought out on cross-examination when defense counsel was pressing Gallegos to explain what Gallegos meant when he had stated that defendant was "possibly" there. Gallegos replied, "I wasn't—well, possibly like I said. They were Hispanic." A trial witness's statement about an offender's ethnicity is admissible as a statement of prior identification, which then may be tested and explored on cross-examination. See *Temple*, 2014 IL App (1st) 111653, ¶¶ 30, 41 (a witness's prior statement that she observed "a white male when she looked out her window" was properly admitted as a statement of identification, where the declarant was available for cross-examination at trial). On appeal, defendant does not argue that the lineup was unduly suggestive. Thus, we cannot find the trial court abused its discretion by finding that any prejudicial effect of Gallegos's lineup testimony was outweighed by its probative value.

¶ 56                                    IV. *Miranda* Warnings

¶ 57    Defendant claims that the trial court erred by denying his pretrial motion to suppress his statement to the police, on the ground that the police did not advise him of his right to stop the questioning. On appeal, defendant acknowledges that some Illinois courts have found that police are not required, as part of their *Miranda* warnings, to inform a suspect that he has the

right to halt questioning at any time.[3] However, defendant argues that these cases are decades-old and that "the *Miranda* rights should include an explicit warning that the accused has the right to cut off or terminate questioning at any time." In addition, defendant argues that, even if "the federal *Miranda* guarantee does not assure such a right," such a right is provided by the Illinois Constitution. See *People v. McCauley*, 163 Ill. 2d 414, 442 (1994) ("Authorities must inform suspects that if they cannot afford an attorney, one will be provided, and that they may ask for one at any time and upon doing so, the interrogation must cease.").

¶ 58    Both the State and defendant agree that *de novo* review is appropriate for this question, which is solely a question of law. *Jones*, 2018 IL App (1st) 151307, ¶ 21 (a pure question of law is reviewed *de novo*).

¶ 59    Normally, "when a trial court's ruling on a motion to suppress evidence involves factual determinations and credibility assessments, the ultimate ruling will not be disturbed on appeal unless it is manifestly erroneous." *People v. Sorenson*, 196 Ill. 2d 425, 430-31 (2001). "This deferential standard of review is grounded in the reality that the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony." *Sorenson*, 196 Ill. 2d at 431. However, a court will "review *de novo* the ultimate question of the defendant's legal challenge to the denial of his motion to suppress." *Sorenson*, 196 Ill. 2d at 431. In the case at bar, when deciding defendant's pretrial suppression motion, the trial court did not hear any live testimony; rather it reviewed only the relevant portion of defendant's videotaped statement. As a result, the evidence before the trial court and the evidence before us is the same. Thus, we agree with the parties that we should conduct a *de novo* review, which means that we perform the same analysis that a trial court would perform. *Jones*, 2018 IL App (1st) 151307, ¶ 21.

¶ 60    For this claim, defendant relies primarily on our supreme court's decision in *McCauley*, where our supreme court stated in *dicta*: "Authorities must inform suspects that if they cannot afford an attorney, one will be provided, and that they may ask for one at any time and upon doing so, the interrogation must cease." *McCauley*, 163 Ill. 2d at 442. In *McCauley*, our supreme court held that, when an attorney came to the police station where the defendant was being interrogated and the police refused either to tell the defendant that his attorney was present or to allow the attorney access to his client, the police violated the defendant's right to counsel under the Illinois Constitution. *McCauley*, 163 Ill. 2d at 423-24; see also *People v. Pitchford*, 314 Ill. App. 3d 72, 78 (2000). Our supreme court held that, although the police did not violate defendant's right to counsel under the United States Constitution, they did violate this right under the Illinois Constitution:

    "Regardless of the United States Supreme Court's *current* views on waiver of the right to counsel under the Federal Constitution, the law in Illinois remains that 'when police, prior to or during custodial interrogation, refuse an attorney appointed or retained to

---

[3]*People v. Merrero*, 121 Ill. App. 3d 716, 722 (1984) ("although an individual has the right to cut off questioning at any time, *Miranda* does not require that the individual be informed of this right as part of the warnings"), *overruled on other grounds by People v. Williams*, 235 Ill. 2d 286 (2009); *People v. Hudson*, 8 Ill. App. 3d 813, 814 (1972) (Defendant "was not advised that he could have stopped the questioning at any time. Such warning, however, is not essential."); *People v. Washington*, 115 Ill. App. 2d 318, 328 (1969) ("[i]t was not necessary that defendant be informed that he could terminate the questioning at any period").

assist a suspect access to the suspect, there can be no knowing waiver of the right to counsel if the suspect has not been informed that the attorney was present and seeking to consult with him.' " (Emphasis in original.) *McCauley*, 163 Ill. 2d at 424-25 (quoting *People v. Smith*, 93 Ill. 2d 179, 189 (1982)).

See also *Pitchford*, 314 Ill. App. 3d at 78.

¶ 61    The *McCauley* court explained:

"Our State constitutional guarantees simply do not permit police to delude custodial suspects, exposed to interrogation, into falsely believing they are without immediately available legal counsel and to also prevent that counsel from accessing and assisting their clients during the interrogation." *McCauley*, 163 Ill. 2d at 423-24.

See also *Pitchford*, 314 Ill. App. 3d at 78-79.

¶ 62    In the case at bar, defendant does not claim that his attorney was at the police station when defendant was being interrogated. Rather, he claims, based on *McCauley*, that the police were required to inform him, prior to questioning and as part of their *Miranda* warnings, that he had the right to terminate questioning at any time. Defendant does not cite a single Illinois case, in the almost 25 years since *McCauley* was decided, that cites *McCauley* for such a proposition or that holds what he asks us to hold based on it. Nor can we find one. Thus, we decline his invitation to expand the required *Miranda* warnings.

## V. Sentencing

¶ 63    Defendant's remaining claims on appeal concern his sentence: (1) that his 40-year sentence is excessive and should be reduced to 20 years; (2) that his 40-year sentence is disproportionate to the 30-year sentence received by codefendant Gary Sams; and (3) that the trial court failed to consider, in mitigation, defendant's youth at the time of the incident and defendant's prior work record. For the following reasons, we do not find that the trial court abused its discretion in determining defendant's sentence.

¶ 64    The sentencing range was between 20 and 60 years, and the State asked for the "fullest" sentence. 730 ILCS 5/5-4.5-20(a) (West 2010) ("Imprisonment shall be for a determinate term of (1) not less than 20 years and not more than 60 years ***."). However, defendant received a sentence exactly in the middle of the sentencing range. At sentencing, the trial court articulated its reasons for selecting 40-year and 30-year sentences for defendant and codefendant Sams, which we provide here in full:

"THE COURT: Well, where do I begin? Certainly I wish that I could offer some explanation or answer to families from both sides in this case. Sometimes there are no answers. Why does evil exist in the world? Why do innocent people have to suffer? I don't know. It is awful, senseless, and it is a tragedy for both sides. Three lives have been lost, and three families are broken and in pain. The [victim's] family will never be able to visit their son except in a cemetery, and [defendant's] and [codefendant Sam's] families, at least they will be able to visit their sons in the penitentiary, but certainly that is not [a] consolation to them.

The Court has had the opportunity to review the Pre-Sentence Investigations, the letters submitted on behalf of all sides, letters in mitigation for [codefendant Sams], I have considered the certificates and this addendum for [defendant], certainly the victim

- 13 -

impact statements are moving and speak greatly of the loss and pain that the family and friends of the [victim's] family are suffering.

[Codefendant Sams] is 39 years old now. I have reviewed his background. It does appear that he had[,] while he was involved actively in the gang when he was younger, he had turned his life around to a certain extent. He was working as a laborer. There are letters of recommendation, letter of good deeds that he had done for his friends and his family. [Codefendant's counsel] read one of those letters here in open court, and now, because of his senseless and stupid act on that night in May, he has ruined his life and severely damaged the life of those who love him. All of that is now flushed down the toilet for his willingness to participate in the beating of somebody simply because he is wearing the wrong color shirt.

With regard to [codefendant] Sams, after considering all the factors in aggravation and mitigation, his rehabilitative potential, judgment is entered on Count 1, and the Court finds an appropriate sentence to be 30 years in the Illinois Department of Corrections.

With regard to [defendant], [he] is a younger man. He was on probation at the time that this occurred, which the Court does find aggravating. He was still the Court believes an active member of the gang. I think he is still an active member of the gang. I don't believe him when he says he is not. The Court heard his statement. The Court believes that he exhibited a certain amount of relish in describing what he did, and he was more active. He was the first one off the porch to beat these guys who he thought were rival gang members.

I have considered his statements, all the factors in aggravation and mitigation, including his rehabilitative potential, and judgment is entered on the finding. The Court finds an appropriate sentence to be 40 years in the Illinois Department of Corrections."

¶ 65    "A reviewing court gives substantial deference to the trial court's sentencing decision because the trial judge, having observed the defendant and the proceedings, is in a much better position to consider factors such as the defendant's credibility, demeanor, moral character, mentality, environment, habits, and age." *People v. Snyder*, 2011 IL 111382, ¶ 36; *People v. Alexander*, 239 Ill. 2d 205, 212-13 (2010). Thus, a sentence within the appropriate sentencing range is usually accorded great deference. *People v. Anaya*, 2017 IL App (1st) 150074, ¶ 102. Although Illinois Supreme Court Rule 615(b) grants a reviewing court the power to reduce a sentence or the degree of an offense, our supreme court has cautioned that this power should be used cautiously and sparingly. *Alexander*, 239 Ill. 2d at 212. As a result, an appellate court "may not alter a defendant's sentence absent an abuse of discretion." *Alexander*, 239 Ill. 2d at 212; see also *Snyder*, 2011 IL 111382, ¶ 36 ("a reviewing court may not modify a defendant's sentence absent an abuse of discretion"). Our supreme court has found that, with respect to a sentence, an abuse of discretion occurs when the sentence is greatly at variance with the spirit or purpose of the law or manifestly disproportionate to the nature of the offense. *Snyder*, 2011 IL 111382, ¶ 36; *Alexander*, 239 Ill. 2d at 212. A reviewing court must not substitute its judgment for that of the trial court merely because it would have weighed various sentencing factors differently. *Alexander*, 239 Ill. 2d at 213.

¶ 66    First, defendant observes that he obtained his GED in 2007, that he was only 20 years old in 2010 when this offense occurred, that between 2010 and 2012 he was employed as a forklift operator, and that his stepmother testified at sentencing that he was a good father, son, and

brother. Although defendant claims that the trial court failed to consider his youth, the trial court specifically observed that defendant was "a younger man." However, the trial court then observed that defendant was also on probation at the time of the offense "which the Court does find aggravating." The presentence investigation report reveals that defendant was on probation for possession of a stolen vehicle when the current offense occurred.[4] In addition, the trial court found that defendant was, and still is, an active gang member. During the sentencing hearing, defendant stated to the court: "I am not a gang member anymore, and I have not been for a long time. I had tattoos removed, moved out of the area where they are located, tried to better my life, and stopped all contact with them." However, the trial court found, specifically, that it had made a credibility determination and that it did not believe defendant when he stated that he was no longer a gang member. After observing defendant's demeanor first-hand, as well as all the evidence at trial, the trial court found "I don't believe him when he says he is" no longer an active gang member. A reviewing court owes great deference to a trial court's credibility determinations. *Sorenson*, 196 Ill. 2d at 431 ("the trial court is in a superior position to determine and weigh the credibility of witnesses, observe the witnesses' demeanor, and resolve conflicts in the witnesses' testimony"). Thus, we cannot find that the trial court abused its discretion when considering defendant's age, education, employment history, and familial roles in light of his probation status and gang membership.

¶ 67    In particular, defendant argues that the trial court failed to consider his young age. In support, defendant quotes the United States Supreme Court's decision in *Roper v. Simmons*, 543 U.S. 551, 570 (2005), stating:

> "The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. From a moral standpoint it would be misguided to equate the failings of a minor with those of an adult ***."

At the time of the offense, defendant was 20 years old, which is years away from juvenile status. "When the legislature draws lines with respect to age, there will always be people who are close to the line." *Jones*, 2018 IL App (1st) 151307, ¶ 73. Defendant asks us to consider a difference of years—not two days or two weeks, but years from juvenile status. "Since there will always be a defendant close to the legislative line, the statute at issue provided the judiciary with the ability to exercise discretion in fashioning an appropriate sentence within a particular range." *Jones*, 2018 IL App (1st) 151307, ¶ 73. In the case at bar, the trial court utilized that discretion to fashion an appropriate sentence.

¶ 68    Defendant also claims that he had a minor role in the offense. While it is true that others stabbed or beat the victim with a bat, defendant admitted in his statement to the police that he was the first one to approach the murder victim, that he was the one who asked the victim for the victim's gang affiliation, and that he kicked the victim in the head when the victim was already down. At sentencing, the trial court considered defendant's statement to the police, observing: "The Court heard his statement. The Court believes that [defendant] exhibited a certain amount of relish in describing what he did and he was more active. He was the first one

---

[4]With respect to defendant's probation, the ASA argued at sentencing that defendant "was given a chance" and "what did he do? He committed murder." The ASA argued, "The Judge that gave him that probation I am sure wishes that he gave him something more now, but no Judge can look in the future and tell that then."

off the porch to beat those guys who he thought were rival gang members." Thus, the trial court did not find that defendant's role in the offense was minor, and on appeal, we cannot find that the trial court abused its discretion in making this finding.

¶ 69 Next, defendant claims that his 40-year sentence was disproportionate because his codefendant Sams received 30 years. However, as we explained above, the trial court did not find defendant's role as minimal as defendant claims. When defendant moved the trial court to reconsider his sentence on the ground that it was disproportionate to codefendant Sam's sentence, the trial court explained that, most "importantly, I feel that [defendant's] involvement in the offense was greater than that of [codefendant Sam's]" because defendant was "leading the charge, so to speak, which the court felt deserved a more severe sentence than that of [codefendant Sams]."

¶ 70 In sum, we cannot find that the trial court abused its discretion in sentencing defendant.

¶ 71 As a final matter, defendant asks to review his sentence not only for an abuse of discretion but also *de novo* to consider whether the trial court complied with the Illinois constitutional provision requiring that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Defendant bases this claim primarily on a recent decision in which the Fifth District stated that it "encourage[d] our supreme court" to review the issue of whether the standard of review employed in sentencing should be expanded to a two-part process. *People v. Etherton*, 2017 IL App (5th) 140427, ¶ 22. In a two-part process, sentences would "be reviewed [*de novo*] to determine whether the trial court followed the constitutional and statutory guidelines *in addition to* whether the trial court abused its discretion." (Emphasis added.) *Etherton*, 2017 IL App (5th) 140427, ¶ 22. However, the Fifth District concluded:

> "After careful consideration, we decline to abandon our supreme court's application of the abuse of discretion standard in reviewing sentences. Our supreme court has extensively considered the propriety of using the abuse of discretion standard in reviewing sentences and has repeatedly upheld the use of this standard. As an appellate court, we are bound to follow the decisions of our supreme court and have no authority to overrule them." *Etherton*, 2017 IL App (5th) 140427, ¶ 21.

Like our sister district, we decline defendant's invitation to employ a different standard of review, and instead employ the standard required by our supreme court.

¶ 72                                        CONCLUSION

¶ 73 For all the foregoing reasons, we affirm defendant's conviction and sentence.

¶ 74 Affirmed.