2020 IL App (1st) 172185-U

No. 1-17-2185

Order filed March 10, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2013 CR 13362 |
| | ) | |
| JIMMIE OLLIE, | ) | The Honorable |
| | ) | Mary Margaret Brosnahan, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE LAVIN delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction is affirmed over his challenge to the sufficiency of the evidence and his contention that he was denied a fair trial by the introduction of gang-related evidence.

¶ 2    Following a jury trial, defendant Jimmie Ollie was found guilty of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2012)) and sentenced to 60 years in prison. On appeal, defendant challenges the sufficiency of the evidence, arguing that the State's witnesses, nearly all convicted

felons, were inconsistent, self-interested, unreliable, and rebutted by the alibi testimony of two defense witnesses. In the alternative, defendant contends that he was denied a fair trial by the introduction of gang evidence that poisoned the jury against him and that had a prejudicial effect that far outweighed any probative value it had on the issues of intent and motive.

¶ 3       For the reasons that follow, we affirm.

¶ 4       Defendant's conviction arose from the May 29, 2013, shooting death of Scottie Cartledge in Chicago. Following his arrest, defendant was charged by indictment with six counts of first-degree murder and one count of being an armed habitual criminal. Prior to trial, the State nol-prossed all but two counts of first-degree murder.

¶ 5       Also prior to trial, defendant filed a motion *in limine* to prohibit the introduction of gang evidence, arguing that such evidence would greatly prejudice him and have no probative value. In turn, the State filed a motion to admit gang evidence, alleging that defendant and Cartledge were in the same gang and that defendant shot Cartledge following a "dispute involving the defendant being disrespected in a territory of the city in which he allegedly carried rank." The State asserted that evidence of gang membership was thus admissible to show a common purpose or design and to provide a motive for an otherwise inexplicable act.

¶ 6       At the hearing on the motion, the State asserted that Cartledge and some other men were charging $5 for entry to a social club located in a particular area of the gang's territory, and that defendant, who carried a "high rank" in the gang, made it clear on the evening of the shooting that he would not be paying the $5 because it was his block. The State also indicated that on that evening, there was a dispute regarding an altercation between Cartledge and a third member of the gang. Thus, the State argued, gang evidence would provide motive and context for an otherwise

inexplicable shooting. Defense counsel countered that admitting evidence of defendant's gang membership and rank would be highly prejudicial. Counsel also argued that the shooting was not inexplicable, as "we have cases all the time where people have a dispute or an argument and somebody gets shot." The trial court ruled that, with the exception of defendant's rank, gang evidence would be admissible. The court reasoned that gang evidence would give context to the relationship between defendant and Cartledge, explain why defendant would "have any say whatsoever or be upset" that Cartledge was in a fight with another individual, and explain why a shooting would occur over a cover charge.

¶ 7     At trial, the State presented five witnesses to the time of the shooting and its aftermath – Billy Ragland, Antoine Gibson, Shaun Lloyd, Nakia McClinic, and Keith Johnson – as well as stipulated evidence and testimony from an evidence technician, a firearms expert, a detective, and an assistant state's attorney. Defendant presented two alibi witnesses.

¶ 8     Billy Ragland testified that he did not know defendant. He stated that on the evening of May 29, 2013, he was with Cartledge and Antoine Gibson, and agreed that all three of them were members of the Conservative Vice Lords. According to Ragland, Cartledge picked him up and they drove around with Gibson, drinking. However, Ragland stated that he did not remember anything else about that night because he was intoxicated. Ragland also did not remember ever going to a police station to talk about Cartledge's shooting, did not remember testifying before a grand jury, and denied that the signatures on the back various photographs, including a photo array, were his. When confronted with portions of his grand jury testimony, he stated he did not remember making any of the statements in the transcript. On cross-examination, he explained that on the day in question, he was "kind of intoxicated" because he had been drinking, smoking

marijuana, and had taken prescription Tylenol 3. He also stated that he drank alcohol and smoked marijuana daily.

¶ 9 Antoine Gibson testified that he had two prior felony convictions. Gibson identified defendant in court as a fellow member of the Conservative Vice Lords and indicated that defendant went by the nickname "Bo." Gibson knew that Cartledge was shot and killed on the night in question, but stated that he did not remember the details of the evening because he was "really intoxicated." What he did recall was driving with Cartledge and Ragland to the railroad tracks on 75th Street between Morgan Street and Carpenter Street, an area the Conservative Vice Lords called the "Back Road"; drinking and smoking marijuana; seeing defendant and Cartledge argue; and after the argument calmed down, hearing gunshots. Gibson did not see who was shooting because he was "really intoxicated" and when he heard the gunshots, he ducked and ran off. Shortly thereafter, he returned to the area and saw Cartledge lying in the street.

¶ 10 Gibson remembered meeting with some detectives but did not recall them showing him any photographs and did not recall circling defendant's images on any photographs. He identified his signature on a photograph and his signature on a lineup advisory form, but stated he did not remember anyone showing him the form. Gibson recalled that he had testified before a grand jury but did not remember specific questions and answers from that proceeding because he "was intoxicated really heavy." Gibson also stated that it had been "a while" since his prior testimony and that his mind was "really messed up from family deaths."

¶ 11 On cross-examination, Gibson stated that at some point after the shooting, he went to the police station because he heard the police wanted to talk to "us." However, the officer he was looking for was not in that day. Six days after the shooting, he went back to the police station

because "we" called the police and they came and picked "us" up. Gibson agreed that he was handcuffed during the transport but explained, "That's their procedure."

¶ 12    Shaun Lloyd identified defendant, whom he knew by the nickname "Bo," in court. Lloyd testified that he, defendant, Cartledge, Ragland, Gibson, McClinic, and Johnson were all members of the Conservative Vice Lords. Lloyd stated that on the night in question, he was at work when he received a phone call and learned Cartledge had been shot. He denied talking with defendant on the phone regarding what happened to Cartledge. However, he admitted that when he testified before the grand jury, he related that he and defendant had a phone conversation on the night in question during which he told defendant, "[M]an, you bogus for killing my little homie," and defendant responded, "I am going to tell you like this, he disrespect me on my joint so I took care of my business." Lloyd also admitted stating in his grand jury testimony that "on my joint means gang turf," and that he understood defendant's statement, "I took care of my business," to mean that defendant shot Cartledge.

¶ 13    According to Lloyd, he heard the police were looking for him on the night in question, so he called them to find out what they wanted. During that call, he learned that the officer he needed to speak to, Detective Martin, would not be in until the next day. Lloyd admitted that in his grand jury testimony, he said that he called the police because he was upset about social media posts showing Cartledge's body on the ground, and that when he called, he actually spoke with Martin and told Martin about the earlier phone conversation he had with defendant about shooting Cartledge.

¶ 14    On cross-examination, Lloyd acknowledged that he had two felony convictions in his background. He reiterated that he never spoke with defendant on the phone regarding Cartledge's

shooting. He explained that he lied to the police and the grand jury because at the time, he and defendant were not "seeing eye to eye" and were having disputes about a woman and gang territory. Lloyd agreed that he lied "essentially to get [defendant] out of the picture." On redirect examination, he clarified that he lied because he thought if he could "get [defendant] out the way, I could have over there."

¶ 15    Nakia McClinic testified that he was not a Conservative Vice Lord but did "hang out" with people in that gang. He identified defendant, whom he knew as "Bo," in court, and stated he did not know if defendant was a gang member. McClinic acknowledged that he had a pending felony case. When asked by the prosecutor whether he had been made any promises regarding that case, McClinic answered, "Not verbally you didn't promise me anything. *** I took it as though you was telling me that, if I scratch your back, you will scratch mine." The prosecutor told McClinic, "Well, you took it wrong." McClinic admitted that he "could have been wrong," acknowledged that the prosecutor never said anything to him about his trial testimony, and stated, "You asked me, and I told you what I been saying throughout when this happened. And I told you that I didn't want to lie on no innocent man."

¶ 16    McClinic testified that on the night in question, he was "out there" with about 15 people, including Ragland, Gibson, and Cartledge, drinking. He did not see defendant that night. McClinic, who "was intoxicated at the time," heard gunshots, ducked, and took off running. He stated that he did not look back to see who was shooting. Shortly thereafter, he returned to the area, learned Cartledge had been shot, and was approached by the police, who took him to the station. McClinic denied having told the police that defendant was at the scene. McClinic stated that he did not remember telling the grand jury that defendant was among the people on the scene on the night in

question or that Cartledge was upset about a man known as "Rah Rah," whom Cartledge thought was involved in the death of Cartledge's brother.

¶ 17    Keith Johnson testified that he had three prior felony convictions and was a member of the Conservative Vice Lords, along with Ragland and Gibson. He identified defendant in court and stated that defendant went by the name "Bo." Johnson stated that during the time frame in question, he ran a "social club" to which he charged $5 admission. When asked whether defendant was angry with him about the cover charge, Johnson responded, "That's something personal between me [and] him." During his testimony, Johnson stated that on the date of the shooting, he had no disagreement with defendant "at all," but also stated it was "not a secret" that he had a disagreement with defendant over the $5 charge.

¶ 18    Johnson stated that on the night in question, he drove by the "Back Road" area. He saw about 20 people, including Ragland, Gibson, and McClinic, as he passed by. He did not see defendant at that time, but had seen him in the area earlier in the day. As Johnson drove by, Gibson called out to him, but Johnson told him he had to go do something and would be back. Later that night, Gibson and Ragland told Johnson that Cartledge had been shot and killed. Johnson recalled testifying before the grand jury but did not remember stating that the reason he did not stop when Gibson called out was because he "don't mess around with [defendant] out there."

¶ 19    Chicago police detective Clifford Martin testified that he spoke with McClinic and Johnson both at the scene and at the police station on the day of the shooting. Later that evening, Martin received a call from Lloyd. According to Martin, he did not know of Lloyd before receiving his call. As a result of those conversations, Martin issued investigative alerts to speak with Gibson and Ragland and arrest defendant. Six days later, Martin interviewed Gibson and Ragland at the police

station. Both men gave video-recorded statements and identified defendant in photo spreads. Portions of both videos were published to the jury pursuant to section 115-10.1 of the Code of Criminal Procedure (Code) (725 ILCS 5/115-10.1 (West 2016)).

¶ 20    In the video of Ragland's interview, Ragland stated that he was hanging out by a car when Cartledge and a "big dude" who went by the name "Bo" started a conversation. The conversation then turned into an argument about Johnson and a man called "Rah Rah." Cartledge walked away, but then returned to Bo and apologized. Bo responded, "It ain't nothing," and the two men parted. Ragland turned to get tissues, and when he turned back, he heard gunshots. Bo was the person shooting. Ragland ran and hid behind a garbage can. He heard more gunshots, and when they stopped, he saw Bo get into a car and ride away. While on camera, Ragland circled the shooter's image in a photo array.

¶ 21    In the video of Gibson's interview, Gibson stated that "Bo" and Cartledge argued about Johnson and a man called "Rah Rah." Specifically, Cartledge told Bo, "You f*** with this b*** a*** n*** that hang with the n*** that killed my little brother," and Bo responded, "You f*** with this b*** a*** n*** [Johnson]." After this exchange, Cartledge walked away and Gibson tried to calm him down. Gibson then walked to the corner to talk with someone else. About a minute later, Gibson heard a gunshot. He ducked, turned, and saw Bo standing in the street. Gibson demonstrated that Bo was holding a gun in his hand pointed toward the ground. Bo then fired more shots. Gibson saw Cartledge lying on the ground. On camera, Gibson viewed a photo array and identified Bo, the shooter.

¶ 22    On June 14, 2013, Martin learned that defendant had been arrested, and on June 15, 2013, Martin went to Rock Island to speak with Lloyd. On cross-examination, Martin acknowledged that

he did not obtain Lloyd's phone records to verify that Lloyd had actually conversed with defendant on the night of the shooting. Martin also agreed that during their interviews, Gibson and Ragland were not free to leave.

¶ 23    Assistant State's Attorney Bridget O'Brien testified that she interviewed and subsequently presented the grand jury testimony of Lloyd, McClinic, Johnson, Gibson, and Ragland. Portions of the grand jury transcripts were published at trial pursuant to section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2016)).

¶ 24    Before the grand jury, Lloyd testified that when he called the police, he acquired the phone number he used by searching for it on Google.

¶ 25    McClinic testified before the grand jury that defendant was among the people at the Back Road on the night in question. McClinic briefly left to buy beer, and when he returned, he did not see defendant anymore. Shortly thereafter, McClinic had a conversation with Gibson, Ragland, and Cartledge during which Cartledge was upset. McClinic related that Cartledge was "venting about it saying that, I don't mess with Rah Rah. I think he had something to do with my brother's death."

¶ 26    Johnson testified before the grand jury that he saw defendant in the Back Road when he drove past, and that defendant's presence was the reason he did not stop. Johnson also testified that when Gibson asked him why he did not stop he told Gibson "I don't mess around. [Defendant] out there."

¶ 27    Gibson testified before the grand jury that he heard defendant and Cartledge arguing. Cartledge accused defendant of associating with "Rah Rah," who "had something to do with [Cartledge's] little brother getting killed," and defendant accused Cartledge of associating with

Johnson. Defendant said that Johnson "try to charge $5 to get in his little social club," and stated, "I ain't paying no $5. This my area." Gibson related that when the argument ended, he walked with Cartledge to McClinic's car and calmed Cartledge down, after which Gibson walked off. About two minutes later, Gibson heard a gunshot. He ducked down. When he got up, he turned and saw defendant standing in the street. Defendant had his "hand down like this." Before the grand jury, Gibson demonstrated that defendant had his right hand extended as if he was holding a gun. Gibson heard more shots and ran away from the area. When he returned, he saw Cartledge lying in the street, "shot up." Gibson also testified that he had identified defendant in a photo spread.

¶ 28    Ragland testified before the grand jury that he heard Cartledge and defendant arguing about Johnson and a man named "Rah Rah." Cartledge did not like "Rah Rah" because he "supposedly got [Cartledge's] little brother killed." Defendant said he did not like Johnson. After more arguing, Cartledge walked away and Gibson calmed him down. Cartledge went back to defendant and apologized. At some point, as Ragland had started to walk off to go to a washroom, he heard gunshots. He ran and hid behind a garbage can. Ragland looked up and saw defendant fire two shots. Defendant then got into a car. Ragland waited a little while, then came out from behind the garbage can and saw Cartledge's body. During his testimony, Ragland identified a photograph of defendant and signed the back of it. He also identified a photo spread in which he had earlier identified defendant.

¶ 29    O'Brien testified at trial that when Ragland appeared before the grand jury, he did not appear to be impaired by any substance, although he had said he had "smoked a little joint."

¶ 30    An evidence technician testified that he received an assignment to process the crime scene at approximately 7:30 p.m. When he arrived, the area had already been taped off. The technician recovered a number of items, including seven fired cartridge cases, a fired bullet or metal fragment, a juice bottle, and various cigarette butts and cups. The technician also recovered five fingerprints from a vehicle.

¶ 31    The parties stipulated that none of the DNA profiles identified from the bottle, cigarette butts, and cups matched Cartledge or defendant; that none of the cartridge cases provided latent fingerprints suitable for comparison; and that the one suitable fingerprint lifted from the vehicle matched Gibson. The parties further stipulated that the medical examiner who performed Cartledge's autopsy would have testified that Cartledge suffered seven gunshot wounds, that he recovered two bullet fragments from Cartledge's body, that the cause of death was multiple gunshot wounds, and that the manner of death was homicide.

¶ 32    A firearms identification expert testified that she examined two fired bullets, one fired bullet fragment, one metal fragment, and seven fired cartridge cases. She determined that the cartridge cases were all fired from the same firearm. She could not identify or eliminate the other items as having been fired from the same firearm and, therefore, could not rule out the possibility that two separate firearms were used in the shooting.

¶ 33    Defendant made a motion for a directed verdict, which the trial court denied.

¶ 34    Kecia Williams testified that about 6:20 p.m. on May 29, 2013, she picked up defendant at 75th and Morgan Streets. There were a "nice amount" of people in the area, including Cartledge and McClinic. At defendant's request, Williams dropped defendant off at 76th and Peoria Streets. As she was leaving, defendant called her and asked to be picked up again because "whoever he

was going to see wasn't there." Williams picked defendant up and drove him to his sister's house at 76th Street and Lowe Avenue. After defendant went inside the house, Williams left.

¶ 35    On cross-examination, Williams admitted she did not remember what she did on May 28, 2013, or May 30, 2013. She stated she had an independent recollection of what she did on May 29, 2013, because it was the day Cartledge was killed and it was the last time she saw him. She stated that on the day in question, she got home from work "around four-something," but also that defendant called her to pick him up "about maybe 10 or 15 minutes before I got to my house, so it was about 6:00 maybe." Williams acknowledged that she never told the police that she was with defendant on the night of the shooting. She also admitted that she had recently talked with defendant's sister about the case. On redirect, Williams agreed that after defendant was charged, she did not feel it would make any difference if she went and talked to the police.

¶ 36    Shante Ollie, defendant's sister, testified that defendant arrived at her house around 6:30 or 6:35 p.m. on the day in question and stayed until 7:30 or 8 p.m. During that time, defendant did not leave the house; defendant played a game with Ollie's son in the front room while Ollie fixed food in the kitchen. On cross-examination, Ollie stated that she had an independent recollection of that evening because they were eating leftover barbecue from the Memorial Day holiday. She denied having had any conversations with Williams about what happened on the day Cartledge was killed. Ollie also admitted never having tried to contact the police, but said it was because she "tried to stay as far away from the police as possible." On redirect, Ollie stated that her love for her brother had not motivated her to lie on his behalf.

¶ 37    The jury found defendant guilty of first-degree murder. The trial court entered judgment on the verdict and merged the two counts.

¶ 38 Defendant filed a motion for a new trial arguing, among other things, that the State had failed to prove him guilty beyond a reasonable doubt, that the court erred in denying his motion *in limine* to exclude gang evidence at trial, and that the court erred in allowing testimony that constituted "irrelevant and highly prejudicial gang evidence."

¶ 39 The trial court denied the motion following a hearing. Regarding the gang evidence, the trial court stated as follows:

"Prior to trial proceeding, we did discuss, I believe extensively, the issue of gang affiliation and what, if any, play it had in this case and I believe that I did do a careful balancing taking into account any prejudicial effect compared to the context that it would give the case itself of the State's witnesses, certainly the victim.

It was very clear to the jury that Mr. Scottie Cartledge himself was gang affiliated so there was nothing in my view that would cause what came out in front of the jury to be overly prejudicial. The defendant's rank or alleged rank in a gang was certainly not allowed but just enough to give context to the evidence itself as well as what the jury was hearing as to possible motivations in this case. So I don't believe there is anything new that was presented to the Court that would have caused the Court to change that ruling."

¶ 40 The trial court subsequently imposed a sentence of 35 years in prison, with an additional 25 years for personally discharging a firearm that proximately caused death, for a total sentence of 60 years. Defendant's motion to reconsider sentence was denied.

¶ 41 On appeal, defendant first challenges the sufficiency of the evidence, arguing that his conviction should be reversed where it was not supported by credible testimony. He argues that the State's witnesses were inconsistent, self-interested, unreliable, and nearly all convicted felons,

and that they were rebutted by the alibi testimony of two unimpeached defense witnesses. Defendant acknowledges that prior inconsistent statements admitted under section 115-10.1 of the Code may be sufficient to support a conviction. However, he asserts that where prior statements are directly contradicted by the declarants at trial, their credibility is greatly reduced, and he urges this court to consider the prior statements in the instant case with skepticism. In particular, he argues that Ragland's and Gibson's prior statements are not credible because on the day of the shooting, Ragland and Gibson were intoxicated and had been smoking marijuana, Ragland had also taken Tylenol 3, neither man was free to leave at the time he spoke with the police several days after the shooting, and both had a strong incentive to shift the blame away from themselves during the police investigation. Defendant argues that McClinic's prior statement that he had seen defendant in the area around the time of the shooting was not credible because once McClinic was made aware there was no "back scratching" deal with the State, he testified that he had not seen defendant. Defendant argues that Johnson's prior testimony carries little weight because it only placed defendant in the area earlier in the day, and that Lloyd's prior testimony that defendant called him and implicated himself in the shooting was not corroborated by phone records.

¶ 42     When reviewing the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). This standard applies to all evidence, including prior inconsistent statements. *People v. Williams*, 332 Ill. App. 3d 693, 696 (2002). The reasonable inferences to be drawn from the evidence are the responsibility of the trier of fact. *People v. Campbell*, 146 Ill. 2d 363, 374 (1992). In addition, the credibility of the witnesses, the weight to be given their testimony,

and the resolution of any conflicts in the evidence are within the province of the trier of fact, and a reviewing court will not substitute its judgment for that of the trier of fact on these matters. *People v. Brooks*, 187 Ill. 2d 91, 131 (1999). Reversal is justified only where the evidence is "so unsatisfactory, improbable or implausible" that it raises a reasonable doubt as to the defendant's guilt. *People v. Slim*, 127 Ill. 2d 302, 307 (1989).

¶ 43 As defendant acknowledges, prior inconsistent statements admitted as substantive evidence under section 115-10.1 of the Code (725 ILCS 5/115-10.1 (West 2016)) alone may be sufficient to support a conviction. *Williams*, 332 Ill. App. 3d at 696. When such statements are admitted at trial, it is the duty of the trier of fact to weigh the conflicting statements and determine which are more credible. *Id.* at 697. A reviewing court will not reassess the credibility of the witnesses or reweigh their testimony, as those functions belong to the jury. *Id.*

¶ 44 In this case, the jury was presented with two conflicting accounts of events. In the first, supported by defendant's alibi witnesses and the trial testimony of Ragland, Gibson, Lloyd, McClinic, and Johnson, defendant either was not present at the time of the shooting, or if he was, he was only seen arguing with Cartledge. In the second account of events, supported by prior statements made by Ragland, Gibson, Lloyd, McClinic, and Johnson, defendant argued with Cartledge, shot him numerous times, and subsequently admitted to the shooting during a phone call.

¶ 45 Based on its guilty verdict, the jury obviously believed the second account. See *id.* That is, the jury chose to believe the prior inconsistent statements of the State's witnesses over their trial testimony, as well as over the trial testimony of the alibi witnesses. This was the jury's prerogative in its role as trier of fact. See *People v. Armstrong*, 2013 IL App (3d) 110388, ¶ 27. We are aware

of the various shortcomings of the State's witnesses that defendant has highlighted in this appeal. However, defendant's argument that the prior statements should be rejected due to those infirmities is unpersuasive because the weaknesses that defendant cites on appeal were all presented to, and rejected by, the jury. See *People v. Baugh*, 358 Ill. App. 3d 718, 737 (2005). Having reviewed all the evidence in the light most favorable to the State, which we must, we find that the jury reasonably could have concluded, after listening to and watching all the witnesses on the stand, that the prior statements made by the State's witnesses were truthful and that the State's witnesses' recantations and the testimony of the alibi witnesses were untruthful. See *People v. Zizzo*, 301 Ill. App. 3d 481, 489 (1998). We find nothing in the record to justify the substitution of our judgment for that of the jury with respect to its credibility determinations. See *id.* at 490. Defendant's challenge to the sufficiency of the evidence fails.

¶ 46 Defendant's second contention on appeal is that he was denied a fair trial by the introduction of gang evidence that poisoned the jury against him and that had a prejudicial effect that far outweighed any probative value it had on the issues of intent and motive. Defendant asserts that intent and motive were more than sufficiently established by evidence that he and Cartledge were arguing about "Rah Rah" and Johnson. He further argues that there was no evidence that Cartledge's death was related to the fact that he and defendant belonged to the same gang. Rather, he maintains that the shooting was "wholly explicable" without reference to gang membership where "drunken men [were] arguing over mutual acquaintances with personal disputes": Cartledge did not like "Rah Rah" due to a belief that "Rah Rah" was involved in the death of Cartledge's brother, and defendant was upset with Black over being charged $5 for admission to his social club. Finally, defendant asserts that even if the gang evidence was somehow relevant, its

prejudicial impact outweighed whatever probative value it had. He argues that there is a likelihood that the gang evidence contributed to his conviction, especially where the prejudice was exacerbated by the prosecution's closing argument, which he asserts "not only portrayed [defendant] as just another armed gangbanger with a propensity to commit crime, but explained its witnesses' inconsistencies by pointing to their affiliation in a gang as well."

¶ 47 Gang-related evidence is admissible where it is relevant to a disputed issue and its probative value is not substantially outweighed by its prejudicial effect. *People v. Johnson*, 208 Ill. 2d 53, 102 (2003). Evidence of gang affiliation is relevant and admissible if it tends to make the existence of any consequential fact more or less probable than it would be without the evidence. *Id.* In addition, gang-related evidence is admissible, despite its prejudicial effect, to demonstrate a common purpose or design or to explain a motive for an otherwise inexplicable act. *People v. Patterson*, 154 Ill. 2d 414, 458 (1992); *People v. Suastegui*, 374 Ill. App. 3d 635, 645 (2007). We review a trial court's evidentiary rulings with respect to gang-related evidence for abuse of discretion. *Johnson*, 208 Ill. 2d at 102. An abuse of discretion occurs when the trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 34.

¶ 48 The shooting in the instant case arose from defendant's displeasure at being charged $5 for admission to a social club. While we agree with defendant that this was a "personal dispute," we cannot agree that the mere existence of an argument over such an inconsequential amount of money provides a complete explanation for shooting a man seven times. Rather, we agree with the State that gang-related evidence was crucial to explaining the motive for the murder. Cartledge was in league with Johnson, whom defendant felt had the audacity to charge him, a fellow

Conservative Vice Lord, $5 to enter a social club located in Conservative Vice Lord territory. This caused defendant to feel he had been disrespected on his turf. This dynamic was specifically illustrated twice in the evidence presented at trial. In his grand jury testimony, Gibson related that he heard defendant accuse Cartledge of associating with Johnson. Defendant then said that Johnson "try to charge $5 to get in his little social club," and stated, "I ain't paying no $5. This my area." Similarly, Lloyd testified before the grand jury that when he confronted defendant about shooting Cartledge, defendant responded, "[H]e disrespect me on my joint so I took care of my business." In our view, without gang-related evidence to provide context and demonstrate motive, defendant's shooting Cartledge seven times over $5 would be an otherwise inexplicable act.

¶ 49    We are mindful that all gang-related evidence carries with it some prejudicial effect. See *People v. Strain*, 194 Ill. 2d 467, 477 (2000) (recognizing that street gangs are "regarded with considerable disfavor" by some segments of society and acknowledging that "particularly in metropolitan areas, there may be strong prejudice against street gangs"). However, gang-related evidence is generally admissible at trial, despite its prejudicial effect, when its purpose is to provide a motive for an otherwise inexplicable act. *People v. Cruzado*, 299 Ill. App. 3d 131, 142, (1998). In this case, where gang-related evidence did just that, we cannot say that the trial court's granting of the State's motion to allow the evidence was arbitrary or fanciful, or that no reasonable person would agree with the trial court's decision. See *Colon*, 2018 IL App (1st) 160120, ¶ 34. As such, we find no abuse of discretion.

¶ 50    For the reasons explained above, we affirm the judgment of the circuit court.

¶ 51    Affirmed.