2021 IL App (1st) 181660-U

FIFTH DIVISION
MAY 14, 2021

No. 1-18-1660

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 11 CR 2249 01 |
| | ) | |
| | ) | Honorable |
| ANGELO COBBINS, | ) | Kenneth Wadas and |
| | ) | Ursula Walowski, |
| Defendant-Appellant. | ) | Judges Presiding. |

_____

JUSTICE CUNNINGHAM delivered the judgment of the court.
Justices Hoffman and Rochford concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The defendant did not receive ineffective assistance of counsel; the trial court did not issue an excessive sentence; and the defendant forfeited his argument that the trial court erred in denying his motion to suppress his statement.

¶ 2    Following a jury trial in the circuit court of Cook County, the defendant-appellant, Angelo Cobbins, was convicted of first degree murder and sentenced to imprisonment of 35 years. The defendant now appeals, arguing that the trial court erred in denying his motion to suppress his statement, that he received ineffective assistance of counsel, and that his sentence is excessive. For the reasons that follow, we affirm the judgment of the circuit court of Cook County.

¶ 3                                    BACKGROUND

¶ 4     The defendant was charged with the January 4, 2011, murder of 59-year-old Benjamin West. The defendant was seventeen years old at the time of the murder. His 15-year-old cousin and co-defendant, Sharee Musgray, was also charged with first degree murder. Co-defendant Musgray pled guilty while the defendant proceeded with a jury trial. Prior to the trial, the defendant filed several pre-trial motions, including a motion to suppress his statement.

¶ 5                               Motion to Suppress Statement

¶ 6     A hearing commenced on the defendant's motion to suppress his statement. The defendant's motion sought to suppress the electronic recorded interview (ERI) which the police conducted following his arrest. He argued that "[d]ue to [his] mental and/or psychological capacity and condition [ ], he was incapable and unable to appreciate and understand the full meaning of his *Miranda* rights ***." Accordingly, the defendant claimed that any statement by him during the interview was therefore not made voluntarily and knowingly.

¶ 7     At the hearing, Detective James Hall testified that, following the defendant's arrest, he interviewed the defendant, along with Detective Dante Servin. They advised the defendant of his *Miranda* rights and conducted the ERI. The ERI was then played for the court at the hearing. The ERI showed that the detectives provided the defendant with each *Miranda* right separately. After the defendant was provided the right to remain silent, he asked what it meant, to which the detectives explained that it meant he did not have to say anything. The defendant then indicated he understood the right to remain silent, as well as all the remaining *Miranda* rights. Detective Hall testified that it did not appear that the defendant had any difficulty understanding him.

¶ 8     The ERI also showed that the defendant was handcuffed to a railing during the

interrogation. Detective Hall testified that the defendant had been handcuffed because the crime lab was planning to photograph his hands for evidence. Once the photographs were taken, the defendant was uncuffed and allowed to move around the room. Detective Hall also confirmed that none of the defendant's family members were present in the interview room during the ERI.

¶ 9    Dr. Ronald Whitmore testified that he was the principal of the school where the defendant attended seventh and eighth grades. Dr. Whitmore testified that the defendant had been placed in special education classes due to a learning disability.

¶ 10    The defendant's mother, Sharon Stanley, also testified at the hearing. She testified that the defendant attended special education classes in school because he is "slow" and "hyperactive." She said the defendant eventually dropped out of high school because "he couldn't read that well."

¶ 11    The parties stipulated to the defendant's school records and they were admitted into evidence. The defendant then rested on his motion and both parties made arguments. The defendant argued that on the day of his arrest, he was 17 years old and "learning disabled." He stressed his struggles in school and claimed that he "was not working with 100% ability" when he was interrogated by the detectives. The defendant also emphasized that he was handcuffed and that his parents were not in the room during the interrogation. He argued that everything considered together demonstrated that he did not voluntarily waive his *Miranda* rights, and therefore he asked the court to grant his motion to suppress his statement.

¶ 12    The trial court denied the defendant's motion to suppress his statement. In so ruling, the trial court found that the defendant's school records did not support a theory that he is not "capable of understanding things." The trial court stated that the defendant's grades in school did not relate to his mental capacity, but rather, to him "not applying himself" and not "showing up" in school.

The trial court found that the video of the ERI was the best evidence in the court's decision making as it showed that the defendant understood his *Miranda* rights and made a voluntary statement. The court rejected the defendant's argument that being handcuffed interfered with the interrogation, noting that the detective explained that they had handcuffed the defendant so that they could take pictures of his hands as evidence and the handcuffs were later removed.

¶ 13                                    Trial

¶ 14    The defendant's jury trial commenced, and the following pertinent evidence was presented. Jasmine Webster testified that she and the defendant had previously been in a romantic relationship and he is the father of her child. On January 4, 2011, she was a high school sophomore and living with her grandmother in a housing complex at 1338 West Hastings Street in Chicago. She awoke at approximately 6 a.m. on the morning in question. As she was getting ready for school, she heard a rock hit her bedroom window, which was on the second floor. She knew it was the defendant trying to get her attention. Ms. Webster went to the window and saw the defendant standing directly below. The defendant asked her to come downstairs, but she refused. The defendant also asked her to skip school and come over to his house, but she told him "no" and closed the window. Ms. Webster then continued getting ready for school.

¶ 15    About 20 minutes later, Ms. Webster heard her sister, Tinithia Traylor, screaming in the adjacent bedroom. Ms. Webster ran into the bedroom and saw her sister "panicking." Her sister told her to call the police because she saw a man lying in the grass outside. Ms. Webster looked out the window about five minutes later. She saw a man lying in the grass on his back. The man was trying to get up. She saw the defendant standing next to the man. The defendant then bent over the man and began hitting and kicking him all over his body and face. Ms. Webster also saw

co-defendant Musgray standing nearby while the defendant beat the man. She then saw the defendant take the man's clothes off and throw them on the ground. Co-defendant Musgray went through the man's pockets; took something from one of the pockets; and said something to the defendant. The defendant and co-defendant Musgray then ran away.[1]

¶ 16    Chicago Police Officer Joe Bresnahan testified that, on January 4, 2011, he and his partner responded to a call of a battery at 1338 West Hastings Street. When they arrived at the location, they saw clothes "strewn" in a grassy area, and saw a man lying under some of the clothes. Officer Bresnahan described the man as follows: "His face was swollen. He was all bloody. He was coughing up blood and very labored breathing." Officer Bresnahan also noted that it was a very cold morning. The man, Benjamin West, was transported to the hospital where he subsequently died.

¶ 17    Dr. Lauren Moser-Wortez, an assistant medical examiner in the Cook County Medical Examiner's Office, testified that she reviewed the autopsy of Mr. West. The autopsy revealed 11 external injuries across Mr. West's body and face. There were also several internal injuries, including swelling in his brain and bleeding under the scalp. The manner of death was determined to be homicide. Specifically, blunt force trauma with hypothermia as a contributing factor.

¶ 18    Detective Alejandro Almazan testified that he was assigned to aid in the homicide investigation of Mr. West. As part of the investigation, he reviewed surveillance footage from the area. In the surveillance footage, he saw a green mini van, which he believed was relevant to the homicide. Detective Almazan and his partner tracked down a green mini van nearby that matched the vehicle in the surveillance footage. They rang the bell to the apartment where the vehicle was

---

[1]Ms. Webster's sister, Ms. Traylor, testified consistently with Ms. Webster.

parked and spoke to Ms. Stanley, the defendant's mother and the owner of the green mini van. She consented to a search of the vehicle and the apartment.

¶ 19    During the search of the apartment, police found the defendant sleeping in a rear bedroom. Inside the bedroom, officers recovered, *inter alia*, jeans with red stains, boots with red stains, two lighters, and a silver ring that had red stains in the creases. The defendant was then taken to the police station.

¶ 20    Terrence Love testified that he is the defendant's cousin. In the early morning hours of January 4, 2011, Mr. Love was at the defendant's house "watching TV" and "chilling" with the defendant. He could not remember if the defendant left the house at any point that morning, but eventually he fell asleep for a bit. Sometime later that day, the police came to the defendant's house and arrested the defendant. The police also took Mr. Love to the police station to ask him some questions. At the police station, Mr. Love gave a videotaped statement to an assistant state's attorney (ASA). He told the ASA that the defendant left the house in his mother's green mini van, and that the defendant "got into it with a clucker," which is a term for a drug addict. He also told the ASA that when the defendant returned, there was dried blood on his hand. Mr. Love then provided the same statements before a grand jury. However, during his testimony at trial, Mr. Love testified that he could not recall making such statements and later claimed that he was forced to make the statements to the ASA and before the grand jury.

¶ 21    ASA Martin Moore testified to the statement provided by Mr. Love; Mr. Love's videotaped statement was admitted into evidence. ASA Dan Piwowarczyk testified to Mr. Love's appearance before the grand jury. The grand jury statement of Mr. Love was later read into the record.

¶ 22    Brian Schoon, a forensic scientist with the Illinois State Police Forensic Science Center,

testified that his lab received a blood sample from Mr. West as well as buccal samples from the defendant and co-defendant Musgray. The lab also received swabs from blood on the defendant's left hand, from a metal ring, from a pair of boots, and from a pair of jeans. The blood from the metal ring, boots, and jeans matched the DNA of Mr. West.

¶ 23    The parties stipulated that Detective Hall would testify that he and Detective Serbin interviewed the defendant following his arrest. The ERI was then admitted into evidence and published to the jury. In the ERI, the defendant told the detectives that he asked to borrow a lighter from Mr. West. He then tried to walk off with the lighter. When Mr. West touched the defendant, co-defendant Musgray hit Mr. West and he fell to the ground. The defendant admitted that he then kicked and punched Mr. West multiple times. The defendant admitted to being drunk at the time and said that was the reason he took off Mr. West's clothes. However, he claimed that he laid the clothes on top of Mr. West to prevent him from getting cold. The defendant also told the detectives that Mr. West appeared to be moving when he and co-defendant Musgray returned to their vehicle. Back at the defendant's house, the defendant told his cousin, Mr. Love, what they had done to Mr. West.

¶ 24    At the close of the State's case, the defendant made a motion for a directed finding, which the trial court denied. The defendant then took the witness stand and testified in his own behalf. He testified that, in the afternoon of January 3, 2011, he and co-defendant Musgray met at the house he shared with his parents and siblings. They smoked PCP and drank vodka for hours. At some point, although he was not sure when, he and co-defendant Musgray left the house in his mother's green mini van and drove around. Eventually, they went to Ms. Webster's housing complex on Hastings Street. Ms. Webster was eight months pregnant with the defendant's child at

the time, but they had broken up. He threw a rock at Ms. Webster's window to get her attention. She came to the window and they had a discussion, but she never came outside. The defendant and co-defendant Musgray drove around for a little bit and then returned to Ms. Webster's housing complex. After sitting in the green mini van for a few minutes, they saw Mr. West standing nearby. The defendant did not know who he was and assumed he was waiting for somebody.

¶ 25    The defendant and co-defendant Musgray exited the green mini van, approached Mr. West, and asked him who he was waiting for. Mr. West looked at them but did not say anything. Co-defendant Musgray then asked Mr. West "for a light." After Mr. West handed a lighter to co-defendant Musgray, co-defendant Musgray "started swinging at him." According to the defendant, co-defendant Musgray continued to hit and kick Mr. West, and eventually Mr. West fell to the ground. The defendant testified that he never hit or kicked Mr. West, and that he tried to "stop the fight" by getting between co-defendant Musgray and Mr. West. Co-defendant Musgray took Mr. West's clothes off and threw them on top of him as he lay on the ground. The defendant and co-defendant Musgray then returned to their vehicle and drove back to the defendant's house.

¶ 26    The defendant claimed that blood got on his boots because he was standing near Mr. West as co-defendant Musgray kicked him. He further stated that he originally told the detectives that it was he who hit and kicked Mr. West, and not co-defendant Musgray, because he was protecting co-defendant Musgray, who was his younger cousin.

¶ 27    At the conclusion of the trial, the jury found the defendant guilty of first degree murder and robbery.

¶ 28                              Posttrial Motion

¶ 29    Prior to posttrial proceedings, new defense counsel filed an appearance. The defendant

filed a motion for a new trial and a supplemental motion for a new trial. The supplemental motion argued, in part, that his trial counsel was ineffective for failing to call co-defendant Musgray as a witness, even though he could have corroborated the defendant's theory of defense that the defendant did not hit or kick Mr. West. The trial court denied the motion for a new trial, noting that defense counsel's decision to not call co-defendant Musgray as a witness was a matter of trial strategy. Notably, the defendant's motion for a new trial did not raise the matter of his motion to suppress his statement which had been denied.

¶ 30                                    Sentencing

¶ 31    During the sentencing hearing, the trial court noted that it had reviewed the defendant's presentence investigation report (PSI) and that it took into consideration that the defendant had a learning disability and substance abuse issues. The trial court also emphasized in its consideration that the defendant was only 17 years old at the time of the offense. The trial court further noted that the defendant came from a loving home and that there was no evidence of peer pressure, especially since co-defendant Musgray was younger than the defendant. Additionally, the trial court noted that it did not see much potential for rehabilitation because the defendant had been charged with six cases of public indecency in jail while he was awaiting trial. The trial court stressed the seriousness of the offense, the "brutal beating of Mr. West, stripping him naked, leaving him to die like a non-human," and noted that the defendant did not seem remorseful. The trial court sentenced the defendant to 35 years for first degree murder and 4 years for robbery, to be served concurrently. The defendant moved to reconsider sentence, which the trial court denied. This appeal followed.

¶ 32                                    ANALYSIS

¶ 33    We note that we have jurisdiction to consider this matter, as the defendant filed a timely notice of appeal following the denial of his motion to reconsider sentence. Ill. S. Ct. R. 603 (eff. Feb. 6, 2013); R. 606 (eff. July 1, 2017).

¶ 34    The defendant presents the following issues on appeal: (1) whether the trial court erred in denying his motion to suppress his statement; (2) whether he received ineffective assistance of counsel when his defense counsel failed to call co-defendant Musgray as a witness; and (3) whether his sentence of 35 years is excessive. We take each issue in turn.

¶ 35    The defendant first argues that the trial court erred in denying his motion to suppress his statement. However, the defendant failed to raise this issue in a posttrial motion. It is well established that, in order to preserve an issue for appeal, it must be raised in a posttrial motion. *People v. Phagan*, 2019 IL App (1st) 153031, ¶ 76. Failure to do so generally forfeits the issue. *People v. Tatum*, 2019 IL App (1st) 162403, ¶ 75. In his reply brief, the defendant concedes that he forfeited this issue by not raising it in a posttrial motion, but nevertheless avers that, regardless of forfeiture, this is a "crucial issue" which requires scrutiny from this court. Such a blanket statement without providing a basis for this court to review a forfeited issue is insufficient. Interestingly, the defendant did not argue that this court should review the issue under the plain error doctrine. "A defendant who fails to argue for plain-error review obviously cannot meet his burden of persuasion" and therefore also forfeits any plain error arguments. *People v. Hillier*, 237 Ill. 2d 539, 545-46 (2010). A defendant cannot fail to properly preserve an issue for appeal and then fail to articulate an argument as to *why* this court should overlook forfeiture, such as the defendant has done here, and yet expect this court to review the issue. Accordingly, we find that

the defendant has forfeited this issue and we will not consider it.

¶ 36    Next, the defendant claims that he received ineffective assistance of counsel when his defense counsel failed to call co-defendant Musgray as a witness. The defendant argues that, had co-defendant Musgray been called to testify, he would have corroborated the defendant's theory of defense that only co-defendant Musgray, and not the defendant, beat Mr. West. He accordingly asserts that he received ineffective assistance of counsel.

¶ 37    Claims of ineffective assistance of counsel are reviewed through a two-part test that was announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and adopted by our supreme court. *People v. Burrows*, 148 Ill. 2d 196, 232 (1992). To prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both that (1) counsel's performance was objectively unreasonable under prevailing professional norms and (2) the defendant was prejudiced. *People v. Veach*, 2017 IL 120649, ¶ 30 (citing *People v. Domagala*, 2013 IL 113688, ¶ 36). Prejudice is a reasonable probability of a different result of the proceeding absent counsel's deficiency, and a reasonable probability is probability sufficient to undermine confidence in the outcome. *Id.* When a reviewing court addresses an ineffective assistance of counsel claim, it need not apply the two-part test in numerical order. *Burrows*, 148 Ill. 2d at 232. We review claims of ineffective assistance of counsel *de novo*. *People v. Demus*, 2016 IL App (1st) 140420, ¶ 21.

¶ 38    Although a decision by trial counsel as to which witnesses to call is generally considered a matter of trial strategy (*People v. Lewis*, 2015 IL App (1st) 122411, ¶ 84), we need not parse that issue because ultimately the defendant here cannot demonstrate prejudice. Even if co-defendant Musgray had testified the same as the defendant and stated that only he, and not the defendant,

kicked and beat Mr. West, it would not have mattered considering the other overwhelming evidence of the defendant's guilt. In particular, the other evidence which overwhelmingly established the defendant's guilt included: the defendant's ERI in which he confessed to hitting and kicking Mr. West; Ms. Webster's eyewitness testimony that she saw the defendant hit and kick Mr. West; and Mr. West's blood being recovered from the defendant's jeans and boots. See *People v. Enoch*, 122 Ill. 2d 176, 202 (1988) (in view of the overwhelming evidence of the defendant's guilt, it cannot be reasonably contended that the results of the defendant's trial would possibly have been different but for the alleged substandard representation by counsel).

¶ 39　Consequently, even assuming *arguendo* that defense counsel had called co-defendant Musgray as a witness and his testimony supported the defendant's theory of defense, it cannot be said that it would have changed the outcome of the trial. Thus, the defendant was not prejudiced. See *People v. Miramontes*, 2018 IL App (1st) 160410, ¶ 19 (a defendant is prejudiced only when there is a reasonable probability that there would have been a different outcome in the defendant's trial). Accordingly, we find that defense counsel did not render ineffective assistance.

¶ 40　Lastly, the defendant argues that his sentence of 35 years' imprisonment is excessive. He claims that the trial court disproportionally considered the facts of the offense in sentencing him. The defendant also avers that the trial court did not properly consider his youth and attendant characteristics since he was only 17 years old at the time of the offense.

¶ 41　A sentence within the appropriate sentencing range is generally accorded great deference by this court. *People v. Colon*, 2018 IL App (1st) 160120, ¶ 65. We accordingly will not alter a defendant's sentence absent an abuse of discretion. *Id.* "Our supreme court has found that, with respect to a sentence, an abuse of discretion occurs when the sentence is greatly at variance with

the spirit or purpose of the law or manifestly disproportionate to the nature of the offense." *Id.*

¶ 42    The sentencing range in this case was 20 to 60 years, and so the defendant's 35-year sentence falls well within that range and is therefore presumed to be proper. See *People v. Knox*, 2014 IL App (1st) 120349, ¶ 46. Nevertheless, the defendant argues that the trial court abused its discretion in sentencing him because it did not consider the following mitigating factors required for juvenile defendants pursuant to section 5-4.5-105 of the Unified Code of Corrections:

"(1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any;

(2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences;

(3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma;

(4) the person's potential for rehabilitation or evidence of rehabilitation, or both;

(5) the circumstances of the offense;

(6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense;

(7) whether the person was able to meaningfully participate in his or her defense;

(8) the person's prior juvenile or criminal history; and

(9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate. However, if the person, on advice of counsel chooses not to make a statement, the court shall not consider a lack of an expression of remorse as an aggravating factor." 730 ILCS 5/5-4.5-105 (West 2018).

Yet, the record shows that the trial court *did* carefully review the defendant's PSI and consider these mitigating factors. Indeed, the trial court *explicitly* noted the defendant's age, his learning disability and substance abuse issues, his home environment, his potential for rehabilitation, the lack of peer pressure, and more. This demonstrates that the trial court tailored an individualized sentence and did not simply issue a blanket sentence as the defendant asserts.

¶ 43    Further, the record shows that the defendant's sentence reflects the defendant's behavior while he was in jail awaiting trial, specifically the six new charges including public indecency. The trial court additionally emphasized the heinous nature of the killing of Mr. West. The defendant not only beat and kicked Mr. West, but also stripped him of his clothes and left him lying on the ground naked on a cold January morning. We note, as likely the trial court did, that the seriousness of the crime is the most important factor to be considered in sentencing. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 28. It therefore cannot be said that the trial court abused its discretion in sentencing the defendant and we affirm his sentence of 35 years' imprisonment.

¶ 44                                   CONCLUSION

¶ 45    For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

¶ 46    Affirmed.