NOTICE
Decision filed 10/01/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220748-U

NO. 5-22-0748

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-1025 |
| | ) | |
| FRANCISCO DOMINGO CASTANEDA, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE WELCH delivered the judgment of the court.
Justices Cates and McHaney concurred in the judgment.

**ORDER**

¶ 1     *Held*:  The defendant's convictions for predatory criminal sexual assault of a child in the circuit court of Champaign County are affirmed where the State proved all necessary elements beyond a reasonable doubt and where the defendant's trial counsel was not ineffective for failing to raise a *Miranda* challenge in a pretrial motion.

¶ 2     This is a direct appeal from the circuit court of Champaign County. The defendant, Francisco Castaneda, was charged with four counts of predatory criminal sexual assault of a child against two victims, C.C.G. and A.F.G. He was convicted by a jury of the two counts of predatory criminal sexual assault of a child against C.C.G. for events that occurred in 2009 and was sentenced to 60 years' imprisonment. The court entered a directed verdict on one of the counts against A.F.G., and the jury returned a hung verdict on the second count against A.F.G. The defendant appeals on

1

the grounds that the State failed to prove an essential element of the charge for the count against C.C.G. requiring intrusion of his penis into her vagina and that his trial counsel was ineffective for failing to raise a *Miranda* issue (see *Miranda v. Arizona*, 384 U.S. 436 (1966)) in a pretrial motion. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4      On September 14, 2020, the defendant was taken into custody for a warrant regarding a traffic violation and was questioned by law enforcement. Interview video one depicts the defendant's police interrogation with Officer Brad Wakefield, a detective with the Champaign County Sheriff's Office, through the use of a Q'anjob'al interpreter. The video begins with Wakefield explaining to the defendant that he was in custody for a traffic warrant but that he wanted to question the defendant on an unrelated matter. He then began to read the defendant his *Miranda* rights from a piece of paper. Officer Wakefield requested that after each right was read that the defendant answer "yes" or "no" as to whether he understood each right. First, Wakefield told him he had the right to remain silent, to which the defendant responded, "yes." Second, Wakefield told him that anything the defendant said could and would be used against him in a court of law, to which the defendant responded, "yes." Third, Wakefield told him that he had the right to talk to a lawyer and to have him present while he was being questioned, to which the defendant answered, "yes." Fourth, Wakefield informed him that if he could not afford to hire a lawyer, but wished to have one, one would be appointed to represent him before any questioning, to which the defendant responded, "I can hire my own attorney but as long as I get a bond so that I can go hire my *** attorney, I don't know how that works." Wakefield responded, "Okay, I mean if *** whenever he *** is able to have *** an attorney[,] the warrant that we're going with, that

2

he's under arrest with tonight, you know, he's gonna go to jail and he can get an attorney at any time throughout this process."

¶ 5    Wakefield then asked again if the defendant understood the fourth admonishment that, if the defendant could not afford an attorney, one would be provided to him, to which the defendant answered, "yes." He then verified that the defendant understood everything they had discussed so far, to which the defendant responded, "yes." The *Miranda* process was approximately 4 minutes and 20 seconds long. The entire interrogation lasted approximately two hours. On September 15, 2020, the defendant was charged by information with four counts of predatory criminal sexual assault, two counts against C.C.G. and two counts against her sister, A.F.G.

¶ 6    On January 31, 2022, the defendant filed a motion to suppress his statements made to police where they were provided without a complete *Miranda* warning and without a knowing and intelligent waiver of his rights. The defendant argued that, at the outset of the sheriff's interrogation, the sheriff started reading the defendant his *Miranda* warnings, with the assistance of Q'anjob'al translator Cristobal Gonzalez, but failed to complete the *Miranda* warnings and failed to advise the defendant that he could decide at any time to exercise his rights and not answer any questions or make any statements. He further argued that the deputy failed to get confirmation from him that he fully understood his rights. The deputy failed to get a signature on the *Miranda* form and instead simply shuffled it under other papers. The defendant did not state that he did not want an attorney present, and the deputy went straight into interrogating him without any assurance that the defendant, who did not speak English and required the assistance of a Q'anjob'al translator, understood his rights and was choosing to waive those rights and answer the deputy's questions. At no point did the defendant voluntarily waive his privilege. The defendant had a grade school education from Guatemala and did not speak English.

3

¶ 7    The defendant argued that the statements elicited by the sheriff's deputies were the result of deceit and trickery on behalf of law enforcement and were elicited in violation of the defendant's fourth, fifth, and sixth amendment rights to the United States Constitution, as well as the applicable and corollary provisions of the Illinois Constitution of 1970, pursuant to section 114-11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/114-11 (West 2018)). The defendant did not knowingly and voluntarily waive his rights; nor did he have the opportunity to invoke his rights before giving any answers or admissions, as was evidenced in the recording of the defendant's interrogation, where the deputy "plowed" into questioning him without advising him that he could decide at any time to exercise his *Miranda* rights and not answer any questions or make any statements; or asked him if he understood his rights and that by answering questions from the deputy, he was waiving those rights. The defendant was not advised that he could invoke his *Miranda* rights at any time during the interrogation. Therefore, the defendant concluded that the State's refusal to comply with the requirements of *Miranda* and secure a voluntary waiver of his rights required the suppression of all statements made by him during the September 14 interrogation. In the alternative, if the trial court decided that the defendant was not entitled to his full *Miranda* warning, the defendant argued the court should suppress the observation by the jury of the video provided by the State that was suggestive of the conclusion the State wished the jury to draw.

¶ 8    On March 28, 2022, the trial court held a hearing on the defendant's motion to suppress. The defendant agreed to use a Spanish interpreter for the purposes of the hearing, despite it being his second language. Wakefield testified that he was the lead investigator on the cases against the defendant. He conducted an interview with the defendant on September 14, 2020. He made initial contact with the defendant at work, as he had made arrangements with the defendant's employer,

4

Plastipak. He made contact with the defendant at approximately 6 p.m., which was the beginning of the defendant's shift. The defendant had an active warrant for his arrest for failure to appear for a traffic offense. He testified that the defendant had multiple aliases and that the warrant was under David Hernandez. The defendant also had approximately six different birthdays on record. The defendant was not a citizen and to Wakefield's knowledge had been deported at least once.

¶ 9 Wakefield testified that the defendant was taken to the Champaign County Sheriff's Office where he was interviewed via interpreter Gonzalez. The interpreter was present throughout the entirety of the interview. He conducted an interview of the defendant, which was audio and video recorded through the use of his bodycam. It was his estimate that the interview lasted two hours. He began the interview by Mirandizing the defendant. People's exhibit 1, which was admitted into evidence, was an excerpt of the interview showing the defendant being Mirandized. Wakefield stated that he began questioning the defendant after he finished reading the *Miranda* warnings and after he confirmed that the defendant understood them. He did not have the defendant sign the *Miranda* form as it was written in English. It was not his routine to have defendants sign the form as that was past practice predating bodycam footage. At no point during the interview did the defendant tell him that he wanted an attorney or that he did not want to talk anymore.

¶ 10 Wakefield identified exhibit 2 as a collection of notice to appear documents, arrest documents, and ordinance violations. Though the documents contained different names, he was able to tie them to the defendant using photographs and personal information contained in the Law Enforcement Agencies Data System and A.R.M.S. databases since the defendant was incarcerated in November 2016. Wakefield also reviewed the defendant's "pen pack" from the Department of Corrections which contained multiple forms that the defendant was required to sign, which

included change of address forms. The forms were all in English. The trial court then took judicial notice of three other criminal cases against the defendant.

¶ 11     The defendant testified that, as to the change of address form dated December 6, 2016, he did not fill out that form and it contained the name of his sister. He also did not fill out the other change of address form containing his sister's name, and in each of the cases the court took judicial notice of, he was represented by a Spanish-speaking attorney. He had a third-grade education in Guatemala and no education in the United States, though he did work. Spanish was his second language. When asked by his attorney whether he believed he needed to answer the officer's questions, he responded "no." His counsel then asked if he believed that he had the right to stay silent and he said "yes." Counsel asked if he felt he could stay silent with the officer asking him those questions, and he responded "yes." When asked if he believed that he fully understood all of the questions the officer asked him, he responded, "no." On cross-examination, he admitted to speaking English and that he had participated in an interview with police in an unrelated matter for one hour in English. He had lived in the United States for approximately 12 years.

¶ 12     On April 1, 2022, the trial court entered a written order summarizing the evidence presented at the hearing as follows. Officer Wakefield testified that he was the lead detective in the two matters against the defendant. There was an active warrant against the defendant in a traffic matter. He arrested the defendant at his place of work at 6 p.m. and took him to the sheriff's office for questioning. The interrogation lasted two hours, and the defendant had the assistance of a Q'anjob'al interpreter. The interview was recorded on Wakefield's bodycam. Wakefield began the interview by reading the defendant his *Miranda* warnings from a sheet of paper. The State played exhibit 1, a video which showed Wakefield reading the *Miranda* warnings to the defendant. These included the right to remain silent, that anything the defendant said could be used against him, the

6

right to talk to an attorney before questioning, and that he could receive a lawyer if he could not afford one. The defendant stated that he understood the rights. The officer did not have the defendant sign a waiver of rights form, however, as officers had only done that prior to the practice of bodycam recording. Throughout the interview, the defendant never said he wanted an attorney or that he did not want to talk to officers.

¶ 13 Prior to the hearing and by agreement of both parties, the trial court reviewed exhibit 3, a video of the defendant being interviewed in English on an unrelated matter. The court also took judicial notice of forms from other cases signed in English by the defendant.

¶ 14 The trial court summarized the defendant's testimony that he did not sign certain forms in the criminal cases and that he was represented by Spanish-speaking attorneys to help him with other forms he did sign. He had a third-grade education, and Spanish was his second language. He admitted to speaking some English and had lived in the United States for approximately 12 years. He also spoke to police for about one hour in English. Concerning the interrogation, he was asked if he believed he needed to answer questions and answered "no"; he was asked if he believed he had the right to remain silent and answered "yes"; and he was asked if he could remain silent, and he answered "yes." He stated that he did not understand all of the questions asked but could not identify a particular question that he did not understand.

¶ 15 After summarizing the evidence, the trial court analyzed the Illinois case law regarding a defendant's right to counsel and the right to remain silent. The court noted that the defendant had raised two grounds for suppression—incomplete *Miranda* warnings and no knowing or intelligent waiver of his rights. The court found that there was no dispute that the defendant was in custody at the time of questioning, and *Miranda* was therefore required. The court found the issue to be whether the defendant waived his rights and then made a voluntary statement. The court found that

7

the defense had not provided it with any caselaw and instead cited to the caselaw provided by the State. The court found the facts in the current case to be even less persuasive than those present in the cases provided by the State, specifically, *People v. Merrero*, 121 Ill. App. 3d 716 (1984), whereas the defendant here had more education, lived in the United States for 12 years, spoke English, and could not identify any particular questions that he did not understand.

¶ 16    The trial court found Officer Wakefield to be a credible witness and that most of his testimony regarding what was said and done during the interview was corroborated by the bodycam footage. The court further found that both the allegations in the motion and much of the defendant's testimony were contradicted by the record. The court therefore found Officer Wakefield more credible than the defendant. The court found that the officer advised the defendant of all his *Miranda* rights and that none were left out. The defendant was asked if he understood his rights, and the defendant answered "yes." The defendant had the assistance of an interpreter in his native language.

¶ 17    The trial court found that the State proved by a preponderance of the evidence that the defendant was properly advised of his *Miranda* rights and made a knowing, understanding, intelligent waiver, followed by the making of a voluntary statement to the officer. It therefore denied the defendant's motion to suppress.

¶ 18    On April 25, 2022, the trial began against the defendant. He was provided an interpreter, Gonzalez, to interpret English to Spanish. C.C.G. testified that in 2009, she lived in a trailer on Toni Lane in Urbana, Illinois. While she was living in the trailer, her father had been deported to Guatemala. She lived in the trailer with her two sisters, her brother, three cousins, aunt, and the defendant. She recalled a night when she was watching television in the living room while

everyone else had gone to the park. She was sitting in the living room when the defendant entered the room, so she went to her room to watch television.

¶ 19    C.C.G. was watching cartoons when the defendant entered the bedroom and asked what she was doing. He sat next to her on the ground and began touching her on her leg. He then carried her to the bed. He picked her up, took her pants off, and inserted his finger into her vagina. He was also rubbing her body from her waist down and then tried to put his penis inside of her. The defendant did not take his pants off, and she did not see the defendant's penis. When asked how close the defendant's penis got to her vagina, C.C.G. responded, "He just rubbed it, like, it was, like, touching it." The defendant's penis was touching her vagina. The defendant then ejaculated on her stomach.

¶ 20    C.C.G. testified to a second incident when she was sleeping and woke up to the defendant pulling a blanket off her. The defendant then took her to his room and put her on his bed. She was facing up on the bed when he took his pants and underwear off, lifted her legs, and tried to put his penis inside her. When asked how close the defendant's penis got, C.C.G. responded, "It didn't get really close." The State then asked what prevented his penis from getting close, and she said, "Because I was so scared. I screamed really loud, and then my cousin[s] *** came out of their room. And they came in my uncle's room, and they were standing in the door, and that's what prevented of [*sic*] him doing that to me." She recounted other instances where the defendant touched her body with his penis either near her vagina or her stomach. She testified that she did not tell her mother about the encounters because the defendant told her that if she did, he would keep doing it and doing it. She was prompted to go to the police and report the defendant because he had recently sent her a friend request on Facebook.

9

¶ 21    C.C.G. and A.F.G.'s mother testified that the defendant was living with them in 2009. She recalled that there was only one television in the living room and no television in the bedroom she shared with her children. In 2013, she and her children all lived in Guatemala. Three of her children returned to the United States and then she returned to the United States with one of her children in 2018. She had not seen the defendant since returning to the United States.

¶ 22    The defendant's nephew also testified that he lived with the defendant and the two sisters in 2009. He recalled an incident where the defendant was on top of C.C.G. and had taken her pants down. The defendant was touching C.C.G. around her body.

¶ 23    A.F.G. testified that she lived in a trailer on Toni Lane in Urbana, Illinois, in 2009. She testified that the defendant was living with her and her family at that time. She remembered a time when she woke up to her sister, C.C.G., crying and noticed that C.C.G. was under the defendant. C.C.G. was not wearing pants or underwear, and the defendant's pants and underwear were also pulled down. She stated, "When I woke up, I heard that my sister was crying, and I got off my bed and I saw what was happening. The TV was on. And I was trying to tell my uncle to get off my— my sister, but he didn't want to get off from her." When asked if he was asleep or awake, A.F.G. recalled, "You can hear that he was drunk maybe because you can hear that he was snoring, and he didn't want to wake up." There were no other adults in the trailer at this time.

¶ 24    A.F.G. testified that everyone moved from the trailer to an apartment in Urbana, including the defendant. She recalled the defendant touching her inappropriately. These instances occurred before the family returned to Guatemala in 2013. As to the first incident, she recalled the following: "So, first, I was in my bedroom, and then I left to—to sit on the sofa to watch TV. My uncle used to have a bed behind the sofa where he was—used to sleep. And he said come with me, let's lay down on this bed. And I said okay. And, then, I told him no, I prefer just to watch TV. And, then,

he came to watch TV with me on the sofa." She then testified that he sat next to her on the sofa and put his finger in her vagina. She could not recall exactly how many times the defendant touched her, but she did remember a second incident. As to the second incident, she stated, "I was in my bedroom, the bedroom that I shares with my family. I was laying down in my bed—on my bed, and I was under my blanket, and he try to come in and remove the blanket, and then he was trying to pull my pants down." She remembered screaming and her sister coming into the room. On cross-examination, she stated that the defendant never touched her while the family was living in the trailer.

¶ 25      Wakefield testified that he was assigned to the defendant's case. He reviewed a report authored by patrol officer Chelsey Keyes that discussed an interview with C.C.G. and A.F.G. He conducted secondary interviews with C.C.G. and A.F.G. From the interviews, he had information on the location of the defendant's employment. On September 14, 2020, he went to the defendant's employer, Plastipak, and made contact. He then brought the defendant to the sheriff's department and interviewed him. The interview was audio and video recorded through the officer's bodycam. He identified exhibit 3 as a portion of the interview with the defendant as it related to the present case. He then identified exhibit 1 as an aerial photograph from Geographic Information Systems circa 2008 that captured a satellite view of a portion of east Urbana. The exhibit showed Toni Lane, which was where the trailer was located that C.C.G. and A.F.G. lived in. The defendant indicated that he had a Facebook page, and Wakefield looked at the page. He then identified exhibit 2A as the defendant's Facebook page. He also identified exhibits 2B and 2C, which were Facebook posts from the defendant's page. He was able to determine that David Hernandez was an alias for the defendant. He was aware that the family lived in the trailer for approximately three years and moved out in 2011.

11

¶ 26    At the close of the State's evidence, the defense moved for a directed verdict. The defense argued that counts 3 and 4 were identical in that they both alleged that the defendant had inserted his fingers into the vagina of A.F.G., but that the evidence demonstrated that there was only one incident where A.F.G. asserted that the defendant inserted his finger into her vagina. For that reason, the defense moved for either count 3 or 4 to be dismissed. The defense also argued that there was no testimony as to count 1, that the defendant put his penis in the vagina of C.C.G. She did testify that the defendant had placed his finger in her vagina. The defense therefore argued that the State had failed to meet its minimum burden as to count 1 relating to the defendant's penis being inserted in the vagina of C.C.G.

¶ 27    The State responded to the defense's motion that as to count 1, C.C.G. did testify that the defendant touched her vagina with his penis. The State pointed to the definition of penetration as any intrusion, however slight. The State argued that:

> "In order for the Defendant's penis to get to a point where it is about ready to enter [C.C.G.]—without getting too graphic—he would have already had to enter a portion of her body. The vaginal opening is not something that is on your hand. It is inside another part of your body.
> He would of had to penetrate, according to the definition of penetrate, a portion of her body to even get to the point where his penis is touching the actual opening that I think he was trying to put his penis in."

As to A.F.G., the State agreed with the defense that there was only one incident that she testified to. The trial court agreed with the parties and entered a directed verdict as to count 4. The trial proceeded on the remaining three counts.

¶ 28    Gonzalo Domingo Teodoro, the defendant's nephew, testified that he lived on the first floor of the same apartment building as the defendant on Silver Street in Urbana. He testified that the

12

defendant lived with the defendant's brother, his brother's wife, and their two daughters.[1] Teodoro began living in the apartment building in February 2010 and testified that the defendant was already living upstairs when he arrived from Guatemala.

¶ 29 The defendant testified that he first arrived in the United States in November 2010. When he first arrived, he lived on Wilson Road in a trailer in Urbana. He lived with his brother, sister-in-law, and their three daughters in the trailer. He lived there for two weeks before moving to the Silver Street apartment with the same brother, sister-in-law, and their daughters. He lived in the apartment for approximately two years. He then moved to Omaha, Nebraska, to live with his cousin. He returned to Urbana in 2013. He lived there for approximately one year and then returned to Guatemala. He moved back to the United States in 2019. He testified that he never lived in the trailer on Toni Lane. He never visited with C.C.G. or A.F.G. in the United States. He visited them in Guatemala, but he never lived with them in the United States.

¶ 30 The defendant denied ever touching A.F.G. or putting his finger in her vagina. He also denied ever putting his penis or finger in the vagina of C.C.G. On cross-examination, he testified that he only knew C.C.G. and A.F.G. by their nicknames, not their real names. He confirmed that when he came to the United States in 2010, he was 20 years old.

¶ 31 The defense rested, and the State called Wakefield in rebuttal. He testified that he was aware of incidents with the police involving the defendant dating back to July 24, 2003; January 25, 2004; July 13, 2005; August 28, 2006; and April 4, 2010.

¶ 32 The case was then given to the jury. At approximately 7:30 p.m., the trial court received a note from the jury asking the following questions. They asked whether they could reach a

_____

[1]For clarity purposes, the two daughters were not C.C.G. and A.F.G. However, the court will not refer to them by name for anonymity purposes.

13

unanimous verdict on one count, but be a hung jury on the other two followed by a parenthesis asking "or a verdict on two with one alleged victim, and a hung on the one with the other alleged victim?" The court answered yes to both questions and gave a *Prim* instruction. The jury returned a verdict finding the defendant guilty as to counts 1 and 2 involving C.C.G. but returned a hung verdict as to count 3 involving A.F.G.

¶ 33    On May 25, 2022, the defendant filed a posttrial motion. The defendant argued, relevant to this appeal, that the State failed to meet its burden of proving beyond a reasonable doubt each element of the offenses charged in counts 1 and 2; that the State failed to prove by competent evidence the defendant guilty of the offense of predatory criminal sexual assault against C.C.G.; the defendant was denied a fair trial and was prejudiced as a result of the State introducing irrelevant, immaterial, and prejudicial evidence; the verdicts were contrary to the manifest weight of the evidence and applicable law and unsupported by competent evidence; the defendant was denied a fair trial where the court erred in denying his pretrial motions, including his motions for a bill of particulars, discovery, his motion to suppress, and his motions *in limine*; the court erred in denying his motion for directed verdict in that he did not place his penis in the vagina of C.C.G.; that the jury's verdict was contrary to the evidence as to the second count regarding C.C.G. as no competent evidence was provided; and that the defendant was denied a fair trial in that the credible and admissible evidence did not show that the defendant was guilty of aggravated criminal sexual assault (counts 1 and 2).

¶ 34    On June 15, 2022, the court held a hearing on the defendant's posttrial motion and his sentencing. The court denied the defendant's posttrial motion and sentenced him to 30 years' imprisonment on each count to be served consecutively and followed by 3 years of mandatory supervised release.

¶ 35    On July 14, 2022, the defendant filed a motion to reconsider sentence. The trial court denied the defendant's motion to reconsider sentence on November 16, 2022. The defendant timely appeals.

¶ 36                                  II. ANALYSIS

¶ 37                          A. Sufficiency of the Evidence

¶ 38    The defendant first argues that the State failed to prove beyond a reasonable doubt that the defendant's penis intruded C.C.G.'s vagina. When the sufficiency of the evidence is challenged, we review the evidence presented at trial in the light most favorable to the prosecution to determine whether any rational trier of fact could have found beyond a reasonable doubt the essential elements of the crime or crimes of which a defendant was convicted. *People v. Saxon*, 374 Ill. App. 3d 409 (2007). We will not reverse a criminal conviction unless the evidence presented at trial was so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt as to the guilt of a defendant. *Id.* at 416. We allow all reasonable inferences from the record in favor of the State, whether the evidence in the case is direct or circumstantial. *Id.* However, a reviewing court will not accept unreasonable inferences from the record. *People v. Cunningham*, 212 Ill. 2d 274, 280 (2004). Because the trier of fact saw and heard the witnesses, its credibility determinations are afforded great weight. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007).

¶ 39    The State alleged sexual penetration occurred when the defendant touched the victim's vagina with his penis. A person is guilty of predatory criminal sexual assault of a child where the accused was 17 years of age or over and commits an act of sexual penetration with a victim who was under 13 years of age when the act was committed. 720 ILCS 5/11-1.40(a)(1) (West 2018); see *People v. Kidd*, 2022 IL 127904, ¶ 20. Specifically, a person commits predatory criminal sexual assault of a child if the following elements are proven: the person is 17 years of age or

15

older; that person either commits an act of contact, however slight, between the sex organ or anus of one person and the part of the body of another for the purpose of sexual gratification or arousal of the victim or the accused, or an act of sexual penetration; and the victim is under 13 years of age. 720 ILCS 5/11-1.40(a)(1) (West 2018).

> " 'Sexual penetration' means any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration. Evidence of emission of semen is not required to prove sexual penetration." *Id.* § 11-0.1.

¶ 40 The Illinois Supreme Court has interpreted this definition to include two types of conduct. See *People v. Maggette*, 195 Ill. 2d 336, 346-47 (2001). The first clause provides for contact, and the second clause provides for intrusion. *Id.*

¶ 41 Here, the defendant was over the age of 17, and the alleged victim was under the age of 13 when the crimes took place; in 2009, the defendant was 18 years old, and C.C.G. was 9 years old. Therefore, the issue is whether the State proved beyond a reasonable doubt that the defendant's penis intruded the vagina of C.C.G.

¶ 42 The State relied on the testimony of C.C.G. and her sister in proving the element of intrusion. According to C.C.G., the defendant laid her down on the bed and tried to put his penis inside of her. She said that the defendant's penis "rubbed" or "was, like, touching" her vagina. When asked by the State if the defendant's penis touched her vagina, she responded "yes." C.C.G. also testified to a second incident where the defendant tried to insert his penis into her vagina.

16

Therefore, based on the testimony of the two sisters, and the jury's credibility determination of said testimony, we do not find that the jury's findings were unreasonable.

¶ 43                                  B. Motion to Suppress

¶ 44    Next, the defendant argues that his trial counsel was ineffective for failing to challenge his *Miranda* waiver of his right to counsel where he invoked his right during his police interview. The defendant argues that his statements referring to hiring private counsel invoked his right to counsel and that the interrogation should have immediately ceased. We disagree.

¶ 45    A criminal defendant has a constitutional right to effective assistance of counsel. U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8. Defendant's claims of ineffective assistance of counsel are evaluated under the two-prong test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *People v. Albanese*, 104 Ill. 2d 504, 524-27 (1984) (Illinois Supreme Court adopting the *Strickland* standard). To prevail, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonableness and that a reasonable probability exists that, but for counsel's errors, the result of the proceeding would have been different. *People v. Bailey*, 2020 IL App (5th) 160458, ¶ 86. "Judicial scrutiny of counsel's performance must be highly deferential." *Strickland*, 466 U.S. at 689. Defendants must overcome the strong presumption that counsel's conduct fell within the wide range of sound trial strategy. *Id.* The failure to establish either prong of *Strickland* precludes a finding of ineffectiveness. *People v. Easley*, 192 Ill. 2d 307, 318 (2000).

¶ 46    The decision to file a motion "is generally a matter of trial strategy, which is entitled to great deference." (Internal quotation marks omitted.) *People v. Gayden*, 2020 IL 123505, ¶ 28. In order to succeed on a claim of ineffective assistance of counsel for failing to file a motion to suppress, or, in this case, failing to raise a meritorious argument in the motion that was filed,

17

defendant must demonstrate (1) the unargued suppression motion was meritorious and (2) a reasonable probability existed that the trial outcome would have been different had the evidence been suppressed. *People v. Patterson*, 2014 IL 115102, ¶ 81. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. However, counsel's failure to raise the strongest basis for suppressing the evidence "does not qualify as objectively reasonable." *People v. Bloxton*, 2020 IL App (1st) 181216, ¶ 27.

¶ 47    Here, the defendant contends that an argument that he invoked his right to counsel during his police interview would have been meritorious because he stated that he needed to get out on bond so that he could hire an attorney. He argues that his statement demonstrating his wish to hire counsel invoked his *Miranda* rights and that the interview should have immediately stopped.

¶ 48    "A defendant's right against self-incrimination is guaranteed by the fifth and fourteenth amendments of the United States Constitution and by article I, section 10, of the Illinois Constitution of 1970." *People v. McCauley*, 163 Ill. 2d 414, 421 (1994). This right against self-incrimination includes the right to attorney representation. *Id.* A defendant may waive this right provided the waiver is voluntary, knowing, and intelligent. *People v. Evans*, 125 Ill. 2d 50, 74 (1988). "In determining whether a defendant knowingly and intelligently waived his right to an attorney, a court must consider the totality of the circumstances, including the characteristics of the defendant and the details of the interrogation, without one circumstance or factor controlling." *McCauley*, 163 Ill. 2d at 421-22 (citing *People v. Reid*, 136 Ill. 2d 27, 54-55 (1990). It is the State's burden to prove, by a preponderance of the evidence, that defendant made a knowing, intelligent, and voluntary waiver of his rights. *Id.* at 422.

¶ 49    In support for his claim that he asserted his right to counsel, and that such a claim would have been meritorious had it been included in the motion to suppress, the defendant argues that

Illinois provides greater protections for the right to counsel than federal law. See *McCauley*, 163 Ill. 2d at 436-39, 442. The defendant cites to *People v. Harris*, 2012 IL App (1st) 100678, ¶ 72, where the First District found that defendant sufficiently invoked her right to counsel where it concluded that "defendant's query, whether it was 'possible' to 'have a few days to get an attorney,' constituted an unequivocal invocation of her right to counsel under *Miranda*."

¶ 50    The defendant also cites to *People v. Rafac*, 51 Ill. App. 3d 1, 3 (1977), where the Third District found that defendant invoked his right to counsel during the course of the officer's questioning when defendant stated that "he didn't think his parents would hire a lawyer for him and asked how he could get one." The interviewing officer informed him that, "if he couldn't afford a lawyer a public defender would probably be appointed for him when he went to court on the following Monday." *Id.*

¶ 51    However, we find both cases distinguishable where here, the defendant merely stated his intention to hire a lawyer, and therefore, did not clearly and unequivocally invoke his right to counsel. After making this statement to Officer Wakefield, the officer again asked if the defendant understood that if he could not afford to hire an attorney one would be provided to him, and the defendant indicated that "yes," he understood. Therefore, trial counsel's failure to include such an argument in the motion to suppress did not rise to the level of ineffective assistance of counsel where the claim was meritless as established by the bodycam footage.

¶ 52                                    III. CONCLUSION

¶ 53    Therefore, based on the foregoing, we affirm the circuit court of Champaign County, including the defendant's convictions and sentence.


¶ 54    Affirmed.